**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Mario MARRERO, Defendant-Appellant.**

**No. 72-1961.**

United States Court of Appeals, Seventh Circuit.

Argued May 21, 1973.

Decided Aug. 9, 1973.

---

**623**

Tyce S. Smith, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., William T. Huyck, Sheldon R. Waxman, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CLARK,\* Associate Justice, KNOCH, Senior Circuit Judge, and PELL, Circuit Judge.

CLARK, Associate Justice.

Mario Marrero, Miguel Garcia and Sandra Teich were charged with conspiracy to violate the narcotic laws and with three separate sales of heroin, all in violation of 21 U.S.C. § 841(a)(1). Garcia pleaded guilty and both Marrero and Teich were found guilty by a jury. Teich, however, is presently a fugitive and only Marrero appeals. He contends that: (1) the evidence was insufficient; (2) the District Court erred in denying his motion for a mistrial based on the testimony of a government narcotics agent that, in "supervising a major investigation," his office maintained files on "major violators" and that it contained a file on a person "named Marrero;" and (3) the District Court erred in denying his motion to require the Government to confess that its informer, Amato, had testified falsely. We have concluded that in the framework of this case only the second claim has merit, and we reverse the judgment on this ground and remand for a new trial.

1. *The Facts.*

The conviction of Marrero depended on the jury's belief of the testimony of

---

\* Associate Justice Tom C. Clark, United States Supreme Court, Retired, is sitting by designation.

Amato, the Government's informer and star witness. Amato was married with three children. He worked as a truck driver. He was a former narcotics addict and had three felony convictions.

Teich introduced Amato to Garcia in a Chicago lounge in early July, 1971. At this meeting there was some discussion as to whether Amato knew any prospects for the purchase of narcotics. A week later Garcia called Amato and asked him again if he had any names of prospects. Amato reported this inquiry to Agents Fullett and Weinstein of the Bureau of Narcotics and Dangerous Drugs. The agents told Amato to "set up a buy" with Garcia. On July 13 Amato went to a room on the third floor of the Diversey Plaza Hotel to meet Garcia. He had received $1250 from the agents to purchase a sample ounce of heroin. Garcia carried the money in a multi-colored bag provided by the agents. Garcia told Amato he could handle the purchase and in the latter's presence made a telephone call and spoke in Spanish language to someone he referred to as "Mario." During this conversation Amato saw a telephone number on a paid of paper with the notation "Mario" written on it. After completing his call, Garcia told Amato that Mario was waiting for them. Amato gave Garcia the $1250 in the multi-colored bag and the two of them went in Amato's car to Clarendon Avenue and Montrose Street. Amato parked and waited. Agent Fullett observed Garcia leave the car and go around the corner on foot with the multi-colored bag in his hand and return some fifteen minutes later. He got in the car, told Amato everything was all right, and they drove back to the hotel. When Amato and Garcia returned to the hotel room, Garcia handed Amato a bag of white powder. Amato left the room and turned the bag over to Agent Weinstein, who had hidden himself behind the stairwell on the third floor. The bag and powder were introduced in evidence, and the powder was stipulated to be heroin. Amato then went with the agents to their office where he made a statement and gave them the telephone number that he had seen written on the pad in Garcia's third-floor room. The agents subsequently retrieved this pad following Garcia's arrest and found the name "Diaz" in addition to "Mario." Appellant admittedly used the name "Diaz."

Between July 13 and 27 Amato saw Garcia and Teich frequently at an apartment at 14 West Elm Street. They talked about narcotics. On July 27 the second purchase (an eighth of a kilo) was set up by Amato and Stacy, another federal narcotics agent. Amato and Stacy met at the Pixley and Ehlers Restaurant and then went to see Garcia at 14 West Elm Street. Garcia agreed to meet them at "Gogi's," a nearby restaurant. Later they returned to 14 West Elm and Garcia went in the building alone. When he returned to the car, the three men drove to Division and Wells Streets, where Garcia gave the heroin to Stacy in exchange for $5000. Another buy was set up with Garcia for the same evening. When they met for the second sale, Stacy complained of the quality of the heroin purchased earlier that day, and Garcia gave him another bag of heroin. Stacy paid him $2500 for this bag two days later.

On September 17 Agent Stacy informed Teich that the two eighth-kilos sold earlier were no good. Teich told them Garcia would make it up, that she and Garcia were partners and that Garcia would supply high quality heroin.

On September 21, 1971, Agent Stacy and Amato met Garcia at the Lincoln Park Zoo. Up until this time the narcotics agents had not met Marrero, although Amato had met him at Garcia's place on West Elm in July or August and had described Marrero to them, and Garcia had told Amato that Marrero was his source of supply. Stacy told Garcia he wanted Marrero to verify the quality of the drugs in person. It was agreed that Garcia would get Marrero and they would all meet at the Zoo at 5:30 p. m. As federal narcotics agents surveilled them, Garcia and Amato drove to a building at 848 West Agatite. Garcia brought Marrero out of the building to

the curb where Amato was standing by his car. Garcia told Marrero that Amato's people refused to do business with him unless Marrero would meet them to verify the quality of the narcotics. Marrero refused to come and said to Amato that "if these people were my friends, then they should accept my word." He added that Garcia was "his man and worked for him and that any deals that Garcia made he would stand behind because of the working relationship . . . if anything was wrong with it [drugs] I [Amato] should come back to him." Two federal narcotics agents watched this meeting. Agent Weinstein overheard Marrero tell Amato and Garcia, "I don't want to meet anybody. I don't want to meet anybody." And Garcia was heard to say, "Mario, look. . . ." Agent Fullett observed Amato, Garcia and Marrero talking together and Agent Weinstein walking near the three men. Eventually Amato and Garcia left without Marrero and returned to the Zoo. There Agent Stacy told Garcia that he would buy the heroin because of Marrero's guarantee to Amato. When Garcia returned with the drugs, he was arrested. Teich and Marrero were arrested later.

### 2. The Sufficiency of the Evidence.

The evidence tended to show that Marrero was aware of the action of his co-defendants. See United States v. Garelli, 333 F.2d 649 (7 Cir. 1964), cert. denied, 380 U.S. 917, 85 S.Ct. 904, 13 L. Ed.2d 801 (1965). Indeed, the evidence pointed to Marrero as the source of supply of the heroin involved. Amato testified that Garcia had told him that Marrero was his source of supply, and Marrero himself told Amato that Garcia was "his man" and that they had a "working relationship." While the evidence was close with respect to some of the counts, taking it and the inferences reasonably drawn therefrom in the light most favorable to the government, United States v. Kwitek, 467 F.2d 1222 (7 Cir. 1972), we believe it was sufficient to support the verdict.

### 3. Alleged Perjury of Amato.

We need not tarry long over Marrero's claim that the Government should have been required to inform the jury that its informer Amato had testified falsely. Government counsel asked Amato if any promises, rewards or remunerations had been offered by the Government for his testimony. He answered in the negative. Defense counsel, out of the presence of the jury, contended that Amato had "told a deliberate untruth" because a three count felony gun charge was dismissed in state court at the request of the federal government. There was no proof linking the dismissal to Amato's testimony in this case. The court permitted defense counsel wide latitude in exploring the issue on cross-examination. The jury was properly left free to draw its own inferences.

### 4. The Testimony Concerning a File on "Major Violators."

In its case-in-chief the Government called BNDD Agent Fullett who testified that he was in charge of the Marrero investigation and was one of the agents engaged in the surveillance of Marrero in the present case. On direct examination he was asked by the Assistant United States Attorney:

Q. "In your capacity as an agent sometimes supervising a major investigation, do you keep a file on major violators in your office?

A. Yes, the government does have various files.

Q. Was there a file in your office on any person named Marrero?

A. Yes, there was."

[Objection]

The court sustained Marrero's objection but denied his motion for mistrial. The judge indicated some doubt that the last question had been answered and, if it had been, whether the jury heard it. Nevertheless, he instructed the jurors to disregard the question and any answer they may have heard. It is apparent that the reporter heard the answer and

we must proceed on the assumption that the jury heard it as well, especially in view of the District Court's uncertainty about the matter.

█ The challenged question and answer are exemplary of a practice that has long been considered impermissible. Twenty-five years ago Mr. Justice Jackson stated the rule and its rationale:

> "Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character . . . but it simply closes the whole matter of character, disposition and reputation on the prosecutor's case-in-chief. The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so over-persuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice."

Michelson v. United States, 335 U.S. 469, 475–476, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948). Unless and until the defendant puts his reputation in issue, the Government is strictly forbidden from introducing evidence of bad reputation.

█ In the present case the Government suggests only one justification for its eliciting the fact that "a person named Marrero" was the subject of "a major investigation file . . . on major violators." Marrero had attempted earlier to discredit Agent Weinstein's identification of him as the man he saw talking with Garcia and Amato on September 21 in front of the building at 848 West Agatite. The Government contends that this defense tactic justified asking Agent Fullett whether he maintained a major violator file on appellant Marrero. Presumably the Government wanted to show that Agent Fullett, who had also observed the meeting of Amato, Garcia and Marrero, was familiar with Marrero's appearance on the basis of government files.

We reject this proffered justification. Marrero never attempted to discredit Agent Fullett's identification of him as the individual who met with Amato and Garcia on September 21st. The Government could not assume, in an effort to beat Marrero to the punch, that he would make such an attempt. In view of the extremely prejudicial nature of the testimony elicited, we cannot dismiss the challenged questions as merely "poor strategy" on the Government's part.[1]

The Government relies on United States v. Pentado, 463 F.2d 355 (5 Cir. 1972) to justify its inquiry about the major violator file. In *Pentado* a Government witness testified in the course of cross-examination that he recognized one of the defendants from pictures "because he is a documented trafficker in our files." 463 F.2d, at 361. The Court of Appeals for the Fifth Circuit affirmed the conviction over appellant's argument that the witness' response warranted a mistrial. The court reasoned that appellant's counsel risked eliciting the challenged testimony by pursuing questions designed to show that the witness might have been mistaken in his identification. In contrast, in the present case the Government itself brought out on direct examination the testimony that "a person named Marrero" was the subject of its major violator file. Furthermore, the Government's questions were directed to Agent

---

1. Government brief, p. 20.

Fullett, whose identification of Marrero had never been attacked; and, in the Government's own words, "it is conjectural whether agent Weinstein had any knowledge of what the Bureau of Narcotics files contained on Marrero . . . ."[2]

It remains to consider whether the challenged questioning requires reversal. As we have indicated, the central issue for the jury in this case was whom to believe, Amato or Marrero. Without Amato's testimony, what little evidence the Government had of Marrero's involvement in narcotics dealing was highly circumstantial and probably not sufficient to sustain a verdict against him on any of the counts. Amato was a Government informer and former narcotics addict. He had been convicted of three felonies. Appellant, who took the stand in his own behalf, had apparently never been arrested or convicted of a crime. Evidence that Marrero was considered a major narcotics violator by a federal law enforcement agency could only have had a devastating effect on his credibility. The jury received the case after hearing a short charge by the court at 2 p. m. on June 5th. It considered the case all of June 6 until 9 p. m. that evening. At that time the foreman asked the bailiff what he should do if the jury was deadlocked. The court then recessed the jury for the night and on the morning of June 7 read them the *Brown* charge.[3] The guilty verdict was returned soon thereafter. The fact that the jury was deadlocked is indication of the closeness of the case. The instruction delivered to the jury that it should disregard the challenged testimony was not sufficient to remove the prejudice. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476

(1968). We need not stop to consider whether the error here was of constitutional dimension[4] for we cannot dismiss it as harmless even if it was not. We have serious doubt that the verdict was free from substantial prejudicial influence. Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). See Fed.R.Crim. Proc. 52(a). If rules of evidence are to command any respect, we must reverse convictions tainted by clear error where there is significant possibility that the accused might have been acquitted in the absence of the error. In the framework of this case certainly such doubt is present. We must, therefore, reverse regardless of our own opinion of Marrero's guilt or innocence. That question is for a jury in a trial not tainted by such inflammatory evidence.

Reversed and remanded.

---

2. Government brief, p. 20.

3. United States v. Brown, 411 F.2d 930 (7 Cir. 1969).

4. Marrero argues, with some force, that the error here denied him due process. If the error is constitutional, the case must be reversed unless the error can be classified as harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Since we find the error not harmless even judged by the lower standard set forth in *Kotteakos, supra*, we need not determine whether the reasonable doubt standard governs here.