### UNITED STATES of America, Plaintiff-Appellee,

v.

### Reyes VARGAS, Defendant-Appellant.

### No. 77–2162.

United States Court of Appeals, Seventh Circuit.

Argued May 23, 1978.

Decided Sept. 18, 1978.

Linda Listrom, Chicago, Ill., for defendant-appellant.

Terry A. Zitek, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT and CUMMINGS, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

CUMMINGS, Circuit Judge.

After an earlier prosecution ended in a mistrial, defendant Reyes Vargas was retried in September 1977 and convicted of distribution of heroin in violation of 21 U.S.C. § 841(a)(1). On this appeal he argues that the evidence was insufficient to support the verdict and that the prosecutors' closing arguments denied him a fair trial. Finding the latter claim persuasive, we reverse the conviction and remand for a new trial.

The prolonged history of the Government's prosecution of Vargas began with his indictment on December 16, 1975. The case was first called for trial on April 29, 1976, but Vargas failed to appear and the district court declared him a fugitive and issued an arrest warrant. A co-defendant, Benito Diaz, was tried and convicted. In April of 1977, Vargas was rearrested and then was tried before a jury on September 21–22, 1977. The jury in that trial reported that it was unable to reach a verdict, causing the judge to declare a mistrial. The case then was retried to a second jury on September 26–28, 1977, which found Vargas guilty. On November 1, 1977, Judge Kirkland sentenced Vargas to three years in custody to be followed by a three-year special mandatory parole term.

Two different versions of a series of events during the evening of September 23, 1975, were presented to the jury at the second trial. The Government established that on that evening eight Drug Enforcement Administration (DEA) agents were conducting surveillance in the vicinity of 47th and South Paulina Streets in Chicago. Co-defendant Benito Diaz, owner of a bar located on Paulina between 46th and 47th Streets, stood outside the bar some time after 8:00 p. m., occasionally walking over to an alley near the middle of the block. About five minutes after Diaz left the bar, agents Ricevuto and Garcia observed Diaz motion a 1975 Monte Carlo automobile, moving south on Paulina, into a vacant lot that adjoined the alley. The car, driven by Vargas, had been creeping along even though there was no traffic on Paulina.

Of the eight DEA agents, only Agent Garcia claimed to have seen what happened after Vargas turned into the vacant lot and after Diaz, who at that time had nothing in his hands, walked over to the driver's side of the car. According to Garcia, Vargas turned in the car and then reached up and handed Diaz a brown paper bag approximately six by six by twelve inches in size. Diaz left with the bag and headed north to meet Maria Hernandez, a Government informant, and DEA Agent Vazquez. After stepping into Vazquez' car, Diaz reported that he had the heroin and requested pay-

---

[*] Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

ment of $26,000. Shortly thereafter, Diaz was placed under arrest.

Meanwhile, Vargas drove out of the vacant lot and proceeded south to the corner of Paulina and 47th. He made a right turn at the corner, parked the car and began walking back to Paulina. At the corner he stopped and looked north, then headed east for half a block, and then turned around and headed back toward Paulina and 47th. He was then arrested and an agent performed a pat-down search.

After Vargas' arrest, his car also was searched and the agents found a pistol and some bullets in a plastic bag partially concealed under the seat. At DEA headquarters Vargas' clothing was searched and Agent Kowalski found a tinfoil packet of heroin in the left front pocket of Vargas' pants. During the search and after being advised of his rights, according to Agent Garcia, Vargas stated that he had met an unknown person at Milwaukee Avenue and 18th Street[1] who gave him several packages, one containing a gun and the other a packet of heroin "for delivering still another package" to Diaz. Vargas did not sign a written statement and no notes were produced by the agents.

Speaking through an interpreter, Vargas testified at trial and described the events differently. After working on September 23 from 7:00 a. m. to 6:30 p. m. at his $300 per week job, he decided to go for a ride and play some pool. He first stopped at a bar where an acquaintance offered to sell him a gun and, apparently in reaction to an earlier burglary of his home, Vargas purchased the gun for $80. Knowing that carrying it was illegal, he placed the gun, wrapped in plastic, under the car seat.

Vargas then drove to the neighborhood around 47th and Paulina. As he drove on 47th Street, he spotted his friend Benito Diaz and pulled into the alley to talk to him. After the two men spoke briefly, Diaz said that he had to return to his bar. Vargas then backed out of the alley, drove south to 47th Street, and made a right turn, rather than the left turn he apparently preferred, due to heavy traffic. He then parked and walked east, crossing the intersection after looking up Paulina to see if any cars were coming. At trial Vargas explained that he continued walking east to look in store windows and to see what movies were playing at a nearby theatre.

During this walk Vargas suddenly was arrested. Agent Ricevuto pushed him against a wall and removed several items from Vargas' pocket: his car keys, a wallet, a nail clipper and some coins. Subsequently Vargas was questioned and admitted having the gun, but denied handing Diaz a bag of heroin and denied receiving any payment. According to Vargas, he did not tell the agents he had been in the vicinity of 18th and Milwaukee.

### I. Sufficiency of the Evidence

■ Because a holding that the evidence was not sufficient to support the verdict would preclude a retrial (see *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1), it is important to consider initially defendant's argument that the Government's evidence was insufficient. Defendant claims that the Government did not prove beyond a reasonable doubt a distribution of the heroin or defendant's knowledge that the distributed substance was heroin. Taking the evidence in the light most favorable to the Government (*Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680), there is ample evidence to support the verdict.

■ The argument that distribution was not sufficiently proven rests primarily on an attack on Agent Garcia's testimony. Defendant claims that Garcia had been on duty twelve to fifteen hours preceding the arrest, and that he gave conflicting testimony at the preliminary hearing, the first trial and the second trial as to his location in observing the transaction, which assertedly is significant because he may not have been able to see the transaction from one of his possible locations. However, Garcia's testimony at the second trial that he was only

---

1. As counsel noted later, there is no such intersection in Chicago. See Tr. 335.

30 feet from Vargas' car was corroborated by two other agents, providing more than a sufficient basis for the jury to disbelieve Vargas' denial, even after weighing the fact that Garcia might have been tired. Such a weighing of the credibility of two witnesses is particularly suited for determination by a jury. *United States v. Martin*, 526 F.2d 485, 486 (10th Cir. 1975).

■ Nor is the evidence insufficient to prove that Vargas knew that the package he handed to Diaz contained heroin. Of course knowledge may be proven by circumstantial evidence. See *United States v. Moser*, 509 F.2d 1089, 1092 (7th Cir. 1975). Here an inference of knowledge could be based on a combination of facts, starting with the fact that Vargas possessed heroin. See *United States v. Moser*, 509 F.2d 1089, 1092 (7th Cir. 1975). Particularly in light of the inconsistencies in his explanation of why he parked his car and began to walk after meeting Diaz,[2] the jury might also have concluded that Vargas' repeated glances up Paulina Street[3] were made in an effort to observe Diaz and his actions subsequent to their meeting; such a conclusion could then have formed the basis for an inference that Vargas had an interest in Diaz' actions because he knew the import of the delivery. Compare *United States v. Pui Kan Lam*, 483 F.2d 1202, 1208 (2d Cir. 1973), certiorari denied, 415 U.S. 984, 94 S.Ct. 1577, 39 L.Ed.2d 881. The jury might also have concluded that the heroin found in Vargas' pocket was received in payment for his transportation and delivery of the bag of heroin,[4] and based on that conclusion the jury might have reasoned that payment in the form of heroin would have underscored Vargas' knowledge of the nature of the transaction. See *United States v. Giles*, 536 F.2d 136, 140–141 (6th Cir. 1976). While possession of this small amount may not alone provide a sufficient inference of knowledge (see *id.*), together with the other circumstantial evidence presented by the Government it is sufficient to preclude outright reversal of the jury's verdict.

## II. Closing Argument

That the prosecutors' closing arguments in this case were not a model of proper, conduct is made clear by the fact that the defendant raised several colorable objections to the prosecutors' comments: it is claimed that they made an unsupported allegation that the defendant sold heroin on prior occasions, that they characterized the testimony in an inflammatory manner, and that they misstated the law to the jury in several different respects. We need not discuss all of these claims because it is our conclusion that on the facts of this case two of the objections are sufficient when taken together, if not also individually, to mandate reversal.

### A. References to Drug Trafficking

Most troubling are the repeated allegations in the argument that the defendant sold heroin on prior occasions. The only apparent basis for these allegations is Vargas' earlier forfeiture of his $10,000 bond.

---

2. For example, the jury could have believed the agents' testimony that Vargas first walked west, and no explanation was offered for the change of direction in light of Vargas' testimony that he was headed for the theatre. Similarly, if the jury believed Agent Ricevuto's testimony that Vargas turned back to the west again after walking only one-half block east of Paulina, Vargas' testimony of heading to the theatre, which was several blocks east, was even less credible.

3. While it is true as defendant contends that Garcia said he saw Vargas glance north only "momentarily" (Reply Br. 3), Agent Ricevuto testified that Vargas looked north and stopped "for at least five seconds" (Tr. 50). Ricevuto further explained that after Vargas crossed the street, he looked north a few more times. Especially given Ricevuto's statement that there was no traffic on South Paulina at the time, the jury was entitled to disbelieve Vargas' testimony that he looked north only to check for traffic.

4. Admittedly there would be little basis for this inference if the Government had not offered a plausible theory of when and how Vargas received the heroin payment, but here Garcia testified that Vargas told him that Vargas had received the packet of heroin from the person at 18th and Milwaukee "for delivering still another package" to Diaz.

The prosecution introduced evidence of Vargas' forfeiture and subsequent departure to Mexico, apparently in order to present evidence of flight as an indication of guilt. At trial Vargas testified that friends and relatives gave him $7,000 of the bond money, that he had contributed $3,000 of his own funds, and that he had spent three weeks raising his bail. He explained that he had returned to Mexico to be with his mother, who was undergoing surgery, and stayed in Mexico to take care of his wife, who had given birth to a child by Caesarean section.

Attempting to capitalize on Vargas' illegal departure, in the first part of the Government's closing argument Prosecutor Meyer told the jury that Vargas had a gun because, as "the testimony has shown," he "knows the heroin business and knows the risk involved." Soon thereafter, the prosecutor reminded the jury that Vargas had posted a $10,000 bond and had forfeited the bond to see his mother in Mexico. Meyer then told the jurors:

> "Use your own reasoning in looking at that evidence that somebody would leave the jurisdiction and forfeit $7,000 belonging to friends and relatives. Would anybody do that? Would any reasonable person do that? No. Reyes Vargas did not do it because that $7,000 did not come from any friends or relatives, that $10,000—the clear inference would be—came from his dealing in heroin; and $10,000 is nothing."

Defense counsel's objection to this assertion was overruled and the court merely informed the jury that it could reject or accept any of counsel's inferences. Immediately after that instruction, the prosecutor continued in the same vein:

> "Look at the fact that Reyes Vargas had $10,000 that he could put up on bond, which he willingly forfeited without the slightest whim or regret. The clear inference is that he had $10,000. He had that much cash because he was involved in heroin trafficking. $10,000 was nothing to him because he could go out the next day and make it up on one transaction."

Before moving on to a different subject, he added: "Money is not a concern of this defendant because he made a lot of money."

■ The defendant characterizes these statements as prejudicial testimony by the prosecutor not subject to cross-examination, while the Government's brief seeks to justify the comments as a legitimate inference from the evidence presented. It is of course true that in closing counsel may make arguments reasonably inferred from the evidence presented. See *United States v. Thomas*, 345 F.2d 431, 433 (7th Cir. 1965); *United States v. Guajardo-Melendez*, 401 F.2d 35, 40 (7th Cir. 1968); but cf. *United States v. Bell*, 535 F.2d 886, 888 (5th Cir. 1976). At some point, however, the inference asked to be drawn will be unreasonable enough that the suggestion of it cannot be justified as a fair comment on the evidence but instead is more akin to the presentation of wholly new evidence to the jury, which should only be admitted subject to cross-examination, to proper instructions and to the rules of evidence. See generally *Griffin v. California*, 380 U.S. 609, 613, 85 S.Ct. 1797, 14 L.Ed.2d 730.

■ In considering whether a suggested inference is reasonably deducible from the evidence of record, in addition to inquiring into the logic of the inference a recognized consideration is whether the evidence would have been subject to a colorable objection if introduced during the trial. See generally *Hall v. United States*, 419 F.2d 582 (5th Cir. 1969). If so, it is important to enforce carefully the limitation that the inference be reasonable not only to avoid abridging the defendant's right to cross-examine possibly untrue testimony but also to prevent a party from presenting to the jury in closing argument a fact that might have been ruled inadmissible at trial (or at least subject to a limiting instruction) simply by asserting in closing argument that the jury could infer it from the evidence that was presented and admitted. See *Pickle v. Cox*, 345 F.Supp. 1009, 1011 (W.D.Tenn.1971); cf. *United States v. Fearns*, 501 F.2d 486, 489 (7th Cir. 1974).

This need for caution is particularly prevalent on the facts of this case, which involves evidence that while arguably admissible was subject to objection under both Rules 404 and 403 of the Federal Rules of Evidence, and that is recognized to be perhaps the most prejudicial type of evidence. See *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168; *Spencer v. Texas*, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606; *McCormick on Evidence* § 190 (2d ed. 1973). In fact, evidence of prior crimes traditionally has been treated with such care that it was only admitted (even when subject to the protections of cross-examination) when proof of the prior crime was clear and convincing. See *United States v. Broadway*, 477 F.2d 991, 995 (5th Cir. 1973); *McCormick on Evidence* § 190 (2d ed. 1973).[5] The fact that in this case the reference to other crimes came not from evidence but from the prosecutor's argument and his suggestions[6] does not undermine the need for such protections but rather enhances it, since "coming from the mouth of the representative of the United States," the statements "carry much weight against the accused when they should properly carry none." *United States v. Meeker*, 558 F.2d 387, 390 (7th Cir. 1977), quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314. See *United States v. Freeman*, 169 U.S.App.D.C. 73, 514 F.2d 1314 (1975).

■ In light of this need for caution, the prosecutor's "inference" that defendant was a heroin trafficker who had made prior deals and "who could go out the next day and make [$10,000] up on one transaction" was impermissible because it did not have a sufficient basis in the evidence presented. The Government did not even attempt to prove that Vargas had ever participated in any other drug transaction. To the contrary, the only testimony on the subject was

Vargas' unrebutted statement that he had no prior criminal record. Nor did the Government even attempt to prove that Vargas had received any money as a result of any heroin deals, even the one proved here. In fact, in arguing the sufficiency of the evidence, the prosecutors implied that Vargas' payment for the delivery was a small packet of heroin. Rather than establishing that Vargas was an experienced dealer or distributor, the Government's case, based on the introduction of Vargas' statement to Garcia, suggested nothing more to the jury than that Vargas' only role was the comparatively minor one of delivering the heroin from one person to another. The Government's case offered no theory to rebut Vargas' statement that his bail money was put up in part by family and friends, and it did not dispute Vargas' plausible claim, given his salary, that he was able to contribute $3,000 himself. On this record the notion that Vargas could go out the next day and make $10,000 in one transaction is inconceivable and therefore the prosecutor's suggestion of that possibility to the jury clearly was improper. It was not a fair comment on the evidence but instead was an unsupported—and perhaps untrue—assertion of a prejudicial fact that ordinarily the jury is permitted to hear only under controlled circumstances, if at all.

### B. Comments Relating to Burden and Standards of Proof

■ It is well established that a prosecutor's misstatements of law in closing argument can be grounds for reversal. See *United States v. Bohle*, 445 F.2d 54 (7th Cir. 1971); *United States v. Phillips*, 527 F.2d 1021 (7th Cir. 1975). Included within this restriction are statements that in effect distort the burden of proof by suggesting incorrectly what the jury must find in order to reach a certain verdict. See *United*

---

5. It is unclear whether this standard was lowered by the Federal Rules of Evidence (see *United States v. Brown*, 548 F.2d 1194, 1206 (5th Cir. 1977)), but at the least such evidence still will not be admitted if it is no more than vague and speculative. *United States v. Jones*, 570 F.2d 765, 768 (8th Cir. 1978).

6. That it is not crucial that the prosecutor does not positively assert the truth of the proposition but rather only suggests it was established in *United States v. Meeker*, 558 F.2d 387 (7th Cir. 1977).

*States v. Segna*, 555 F.2d 226 (9th Cir. 1977).

In the Government's rebuttal argument, Prosecutor Lytton explained at length that there were sharp, unavoidable differences in the testimony, so that somebody must be lying. After emphasizing the testimony of Agents Ricevuto, Garcia, Collins, Kowalski and Fanter, and explaining that if Vargas was believed, each of the agents must have lied, he concluded:

> "these Federal agents have come in and testified under oath as to what they observed; and if you find the defendant not guilty, I want you to write on there that all of those people lied. Ricevuto is a liar. Garcia is a liar. Collins is a liar. Kowalski is a liar. Fanter is a liar."

The other alternative, Lytton informed the jury, was a verdict of guilty.

Even assuming that the testimony of the prosecution and defense witnesses contained unavoidable contradictions, it of course does not follow as a matter of law that in order to acquit Vargas the jury had to believe that the agents had lied. If the jurors believed that the agents probably were telling the truth and that Vargas probably was lying—or even if the jury was convinced that all of the agents save Garcia were telling the truth and thought that Garcia probably was telling the truth—it would have been proper to return a verdict of not guilty because the evidence might not be sufficient to convict defendant beyond a reasonable doubt. To tell the jurors that they had to choose between the two stories was error. See *United States v. Stanfield*, 521 F.2d 1122 (9th Cir. 1975).

*C.  Prejudice of These Errors*

Having established that the prosecutors' arguments were improper, it is necessary to consider whether the error was harmless. See *United States v. Phillips*, 527 F.2d 1021, 1025 (7th Cir. 1975). Despite the fact that the first of these improprieties prompted some intervention by the district court and the second was allowed without defense objection, the judge's instruction was insufficient to reduce the prejudice of the prosecutor's first comment[7] and the second impropriety, like the first, constituted plain error on these facts. Compare *United States v. Segna*, 555 F.2d 226 (9th Cir. 1977); *United States v. Fearns*, 501 F.2d 486 (7th Cir. 1974). At least when taken together, these errors were prejudicial in this case for the following reasons:

First, it is well recognized that evidence of a prior crime or of criminal propensity is particularly prejudicial evidence. *United States v. Phillips*, 401 F.2d 301, 305 (7th Cir. 1968). Recognizing the uniquely harmful aspects of such evidence, we have found reversible error based on overemphasis of prior criminal conduct even when that conduct has been admitted for a proper purpose. *United States v. Dow*, 457 F.2d 246 (7th Cir. 1972). When, as here, evidence of such conduct was not properly admitted, its emphasis is even more regrettable. See *United States v. Fearns*, 501 F.2d 486 (7th Cir. 1974).

Second, as the statement of the facts of this case reveals, the prime issue was credibility. While the Government contends that "on the evidence it was not a close case" (Br. 16), that contention is true only if Vargas was found unbelievable as a witness. In *United States v. Marrero*, 486 F.2d

---

7. As noted above, the district court only informed the jury, both immediately after defendant's objection and in its final instructions, that inferences suggested by counsel can be rejected and that arguments are not evidence. However, even considerably broader and more emphatic instructions have been held not sufficient to eradicate prejudice after a prosecutor makes unsupported allegations of a defendant's prior criminal conduct. See *United States v. Meeker*, 558 F.2d 387 (7th Cir. 1977). In light of the considerable weight given to assertions by prosecutors (see *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314), it is also of little solace to a defendant that the jury was told by the defense attorney or the judge that those assertions were not technically evidence and that no evidence that had been introduced supported those assertions. Compare *United States v. Marrero*, 486 F.2d 622, 627 (7th Cir. 1973), certiorari denied, 423 U.S. 862, 96 S.Ct. 120, 46 L.Ed.2d 90. See generally *Spencer v. Texas*, 385 U.S. 554, 575, 87 S.Ct. 648, 17 L.Ed.2d 606.

622, 627 (7th Cir. 1973), certiorari denied, 423 U.S. 862, 96 S.Ct. 120, 46 L.Ed.2d 90, this Court noted that testimony that a defendant "was considered a major narcotics violator by a federal law enforcement agency could only have had a devastating effect on his credibility." Regrettably, the prejudice induced by such a statement was compounded in this case when the jury was told in effect that it had to find that all the Government agents had lied before it could rely on Vargas' story.

Related to the effect on Vargas' credibility is the impact of the prosecutor's mention of other drug-dealing activity on the question of whether Vargas possessed the requisite knowledge. It is well established that a prosecutor's comment about prior involvement with drugs "could well persuade a jury to draw an inference of knowledge." *United States v. Martinez,* 514 F.2d 334 (9th Cir. 1975). Since knowledge was a disputed issue and the Government's proof of it while sufficient was not overwhelming, this possible effect on the jury's consideration of the knowledge issue added to the prejudicial nature of the comments.

█ Finally, even disregarding any impact of the comments on the fairness of the verdict, one of the comments deserves attention due to its potential effect on the Eighth Amendment rights of defendants. While the thrust of Prosecutor Meyer's comments may have been aimed at the ease and lack of care with which Vargas forfeited bail, a part of those comments sought to imply, or at least could reasonably have been interpreted as inviting the inference, that Vargas was a heroin dealer because he posted a $10,000 bond.[8] By analogy to comments on the exercise of the Fifth Amendment right not to testify, such comments are improper because they "cut down" on a

constitutional privilege—here the privilege of posting bond once it is set (see *Stack v. Boyle,* 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3)—"by making its assertion costly." Compare *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106; *United States ex rel. Macon v. Yeager,* 476 F.2d 613 (3d Cir. 1972), certiorari denied, 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104; *United States v. Hughes,* 389 F.2d 535 (2d Cir. 1968), certiorari denied, 396 U.S. 867, 90 S.Ct. 145, 24 L.Ed.2d 120. While we need not rely upon it here, in an appropriate case such a comment might justify reversal even absent indications of other types of prejudice.[9]

In this case, however, indications that the improprieties were prejudicial are manifest. Unfortunately, such improprieties are not rare grounds for appeal in this Circuit, and neither are our findings of error or cautions to the Government in such cases. See, *e. g., United States v. Meeker,* 558 F.2d 387 (7th Cir. 1977); *United States v. Hollinger,* 553 F.2d 535, 548 (7th Cir. 1977); *United States v. Duff,* 551 F.2d 187 (7th Cir. 1977); *United States v. Jackson,* 542 F.2d 403, 411, 412 (7th Cir. 1976); *United States v. Spain,* 536 F.2d 170, 176 (7th Cir. 1976), certiorari denied, 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97; *United States v. Phillips,* 527 F.2d 1021 (7th Cir. 1975); *United States v. Fearns,* 501 F.2d 486 (7th Cir. 1974). If our repeated exhortations to prosecutors to follow the dictates of *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, and to recognize that it is their duty to see that justice is done, have not been sufficient to reduce these improprieties, perhaps prosecutors will be more careful when they realize that such improper and at least in this case unnecessary remarks will cause the reversal of an otherwise carefully wrought conviction.

Reversed and remanded for a new trial.

---

**8.** Thus the prosecutor asked the jury to "[l]ook at the fact that Reyes Vargas had $10,000 that he could put up on bond * * *."

**9.** Because defendant showed sufficient prejudice to justify reversal even if the errors were not of a constitutional dimension (see *United States v. Marrero,* 486 F.2d 622, 627 (7th Cir. 1973), certiorari denied, 423 U.S. 862, 96 S.Ct.

120, 46 L.Ed.2d 90, we need not decide whether the prosecutor's comments violated the Sixth Amendment right to confrontation. The showing of prejudice also was sufficient enough so that we need not decide whether to give any weight to the fact that an earlier trial without these improprieties in the closing argument ended in a mistrial.