**Affirmed and Memorandum Opinion filed December 4, 2012.**



In The

# Fourteenth Court of Appeals

### NO. 14-11-00449-CR

**COREY DESHUN FARROW, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 180th District Court
Harris County, Texas
Trial Court Cause No. 1280572**

## MEMORANDUM OPINION

Appellant, Corey Deshun Farrow, appeals his conviction for aggravated sexual assault and sentence of forty years' incarceration. In a single issue, appellant claims the

trial court erred in overruling his objection to the State's closing argument because the State shifted the burden of proof. We affirm.

## BACKGROUND

The complainant, Janil Farrow, first met appellant in 1991 when they were both living in Eagle Lake, Texas. Janil became pregnant in November 1991 with appellant's son. Appellant and Janil broke up before their son was born. Janil was married to appellant's cousin for a time and had two more children. Appellant and Janil got back together in late July or early August 2009. At that time, appellant was also seeing two other women, Anna Esparza and Georgialynn Hemfield. Appellant moved in with Janil and her children in September 2009. At that time, appellant told Janil that he was no longer seeing Esparza or Hemfield. However, appellant admitted at trial that he was still seeing Esparza although he had told Janil otherwise.

Appellant and Janil were married on November 13, 2009. Right after they were married, appellant told Janil that he wanted an annulment. Nearly every week of their marriage, appellant and Janil would get into a fight, with appellant leaving on Wednesday to go to Eagle Lake and returning to Janil's apartment on Sunday. Janil thought appellant was going to his mother's house and did not believe that he was with other women.

Janil and appellant went to Louisiana for Valentine's Day of 2010. When they returned to Houston, appellant and Janil had their ring fingers tattooed with each other's names. Things turned violent in their relationship when appellant choked her. Janil was afraid to leave appellant at that point, and appellant stayed with Janil the entire following week.

On the evening of February 20, 2010, appellant and Janil were at home. Janil testified that they both consumed cocaine and Ecstasy. Janil believed that the drugs were out of her system by the next day, February 21, 2010, when appellant, Janil, and Janil's children went to Janil's cousin's house in Eagle Lake for a housewarming party and a birthday party for one of Janil's sons. Appellant went to the party for ten minutes, then

2

went outside and sat in the car because he felt that Janil's family did not like him. Appellant then left in the car and went to Esparza's house. Appellant returned, sat outside with a friend, and then left to go to Esparza's house again. According to Janil, when appellant returned to the party, he looked mad and told her to come outside and to get into the car. They left and drove back to Houston. Janil's children were not with them because they were staying with their grandparents. Janil testified that appellant accused her of sleeping with one of her male cousins. Janil denied the accusation.

The argument continued after they arrived back at Janil's apartment. Appellant told Janil that his brother and friend said they had slept with her. Janil said his brother and friend were lying. When appellant questioned Janil about whether she had been cheating on him since they had been married, she said she had not. Appellant told Janil that if she kept "lying that he was going to knock [her] teeth out of [her] mouth." Appellant told Janil to show him the outfit she was wearing when she was with the last guy she had slept with before she was with appellant. When Janil showed him the outfit, appellant said she did not have that outfit until after they were married and that she had cheated on him.

Appellant broke her personal cell phone and her work cell phone after looking at the numbers on them. Because appellant would not believe that she had not cheated on him, Janil finally told appellant that she had. Appellant started hitting Janil on the back of the head with closed fists, and he kicked her in the side. Appellant told Janil that there "wasn't nothing good about [her] but [her] hair." Janil had long, thick, curly hair. Janil testified that appellant had admired her hair and complemented her on it. Appellant got his clippers and started shaving her head. When the clippers became tangled in Janil's hair, appellant tried to shave her head with razor. Appellant then told Janil to cut off the rest of her hair. Janil did as she was told.

Appellant told Janil to sit on the bed. He then put a gun to her lips and told her "to give him one reason why he shouldn't kill [her]." Janil responded that she "had his son."

3

Appellant said, "Bitch, you better be glad that you have my son." Appellant put the gun away and told Janil to take off her clothes and to perform oral sex on him. Appellant then raped her anally and vaginally. Appellant told her to perform oral sex on him again, and then he eventually fell asleep.

Janil sat in the bath tub for five or six minutes because she was hurting. Janil did not leave at that time because she was scared that if she "made the wrong move and [appellant] woke up and didn't want her to leave, he would do something to [her]." Eventually, Janil, who was wearing a hoodie, quietly unlocked and opened the front door, but did not close it all the way as she left because she was afraid the noise would wake up appellant. Janil drove to the hospital emergency room because she was hurting and was worried that she had a concussion. Janil did not tell the emergency room staff that she was sexually assaulted or that it was appellant who had hurt her.

Janil then went to the apartment of her cousin, Michelle Nelson, because appellant did not know where Nelson lived. Initially, Janil only told Nelson that "[she] and Corey got into it." The next morning, Janil told Nelson that appellant had sexually assaulted her. Janil pulled back her hoodie and showed Nelson her shaved head. Nelson told Janil that she needed to call the police. After contacting a battered women's shelter, Janil reported the attack that day.

Officer Alan Sweatt, a patrol officer, from the Houston Police Department (HPD) met with Janil at Nelson's apartment. Janil did not tell Sweatt that she had been sexually assaulted because she was afraid. However, Sweatt observed that Janil's "head was shaved bald," and she "had some bruising on her head and she was kind of moving gingerly, like she was pretty sore." There were injuries around her head and forehead, and one of her cheeks was swollen. Janil's injuries looked like they had "occurred fairly recently." He also noticed that Janil looked "upset" and "a little scared" and she "started to break down and cry a little" when she told him what had happened.

4

Janil met with a counselor in the HPD family violence unit, Alma Gonzalez, three days after the assault. Gonzalez took photographs of Janil that showed cuts and bruises to Janil's head. According to Gonzalez, Janil's "demeanor was that of fear. She was very shaken up, very emotional when she described" the assault. Janil "kept crying. She kept holding herself." Janil "was a bit shameful, because when she came in," she was wearing a hoodie with the hood on. Janil was "nervous, like she was afraid someone might show up to do something." After Janil had described the physical abuse, she started to tell Gonzalez about the sexual assault. At that point, Gonzalez ended the interview because the case would have to go to the HPD sex crimes division.

A sexual assault examination was performed on Janil three days after the assault. The exam did not result in the collection of any significant evidence. The nurse who had performed the exam explained that taking a bath and changing clothes might compromise the recovery of evidence. Janil had taken a bath and changed clothes immediately after the assault.

Jimmy De Los Santos, the investigator with the HPD sex crimes unit who met with Janil five days after the assault, did not notice any injuries on Janil, but he did observe that she was "very scared" and "afraid of anybody that would come near her." Janil "was especially afraid of the suspect, claiming that he had threatened to kill her." After appellant had been arrested, Janil returned to the apartment with Nelson and a friend to retrieve clothes for herself and her children, leaving behind everything in the apartment.

Appellant testified at his trial. In 1995, appellant was convicted of aggravated robbery and sentenced to prison. He was paroled in July 2009. Appellant had worked off and on in construction since July 2009. Appellant admitted that he was seeing Janil, Esparza, and Hemfield at the same time. According to appellant, Janil was okay with his other relationships until he moved in with her, at which time she wanted their relationship to be exclusive. Appellant explained that his "frequent separations" from Janil involved

5

his leaving because he did not want any confrontations with Janil. Appellant testified that he was concerned that Janil would tell "lies" to the police. Appellant described an incident when he was packing his clothes to leave, and Janil told him that her purse was missing and threatened to tell the police that he had stolen it.

Appellant told a different version of the events that took place during the drive back to Houston from Eagle Lake and after they had returned to the apartment. According to appellant, Janil was upset because her car was seen at Esparza's house during the party. Appellant tried to apologize, but Janil would listen to him. Appellant had a job laying tile in Fort Bend County the next day and went to bed around 10:30 or 11:00 p.m. Appellant testified that he did not try to have sex with Janil. He woke up the next morning around 7:00 or 8:00 a.m., and Janil was not there.

Appellant testified that Janil was lying about his questioning her about other men prior to the time they got back together, beating her, shaving her head, and sexually assaulting her. Appellant further denied breaking Janil's cell phones and owning a gun since he has been out of prison.

On July 26, 2010, while appellant was in jail, he wrote Janil a letter, which stated, in part:

> First off I want to say that I'm really really sorry for the way things ended between us. I wanted so much for us to be together forever and it really hurt me when what happened happened and I lost it. I know that's no excuse and it's unacceptable, and if I could take it back I most definitely would, but I can't. I can only apologize to you for it and hope that you can forgive me. Because even though it's selfish and probably inappropriate of me to ask, I have to. My life depends on it. Even though it does though, I won't attempt to play on your emotions. You have every right to hate me. But I will ask you for the same thing you asked me for, to spare me.
>
> Now they need you to testify against me in court in order for them to convict me. I'm asking you with my very life please don't do that. There's nothing these people can do to you for writing me an affidavit and not going to court against me. They are going to try to subpoena you to court when it's time for me to go to court. They will tell you all kinds of stuff,

6

but they can't make you testify against me unless you want to. Especially in your case because you didn't file the charges, the people at the shelter did. So they will be using you as there [sic] witness. But you can tell them that you don't want to testify and not matter what they say they can't make you. So don't let them scare you. I'm in a tank where most of us here have the same case and niggas getting their cases thrown out every day because their girls are writing affidavits for them and not showing up at court. You can tell them anything, you caught me cheating and was mad but now you see how serious this is and how much time I can get and you don't want to go through with it. And that's even if they find you and ask you to come to court. It all depends on if the D.A. wants to spend the money to send someone out to subpoena you.

These people are saying that I raped you at gunpoint! Now I know you didn't say that but that's how these white folks got it put together. They said that I put a gun to your head and raped you up the ass. Now we both know what happened and I understand if you hate me, but you know what they are saying is not true and I'm asking you to please don't let them kill me like this. I'm asking you to please forgive me, and help me out, but if for some reason you can't forgive me and won't help me, then know that I'll be hurt but I won't hate you for it because I can't.

When cross-examined about the letter, appellant stated that he knew Janil would have to testify in order for him to be convicted. According to appellant, Janil told him that she had lied, but that State would prosecute her for perjury if she did not testify against him.

The jury found appellant guilty of aggravated sexual assault, and the trial court assessed his punishment at forty years' incarceration.

**ANALYSIS**

In his sole issue on appeal, appellant complains that the trial court erred in overruling his objection to the State's closing argument in the guilt-innocence phase of the trial because the State shifted the burden of proof to appellant. The State argued the following:

> [THE STATE]: . . . . This case completely totally boils down to whether you believe Janil Farrow or whether you believe Corey Farrow.

7

And his own words tell you what it is about. They need you to testify in court in order for them to convict me.

> *The only way that he walks out of here today is if you believe him over what she told you.*[1]

[DEFENSE COUNSEL]: Judge, that's a misstatement of the law. I'll object.

THE COURT: It is overruled. It's final argument.

[THE STATE]: And even the defendant knows that that is what it boils down to.

Your job, and you knew this from jury selection, is to judge the credibility of the witnesses. And that's exactly what this boils down to. We know that Janil Farrow is telling the truth. And we know that multiple, multiple ways.

Appellant argues that the prosecutor's comment instructed the jury that it must return a guilty verdict unless it finds appellant's testimony more credible that the Janil's testimony, thereby lessening the State's burden of proof and shifting its burden to appellant.

The State responds that appellant failed to preserve his complaint on appeal. We agree. To preserve a complaint for appellate review, the record must show that a specific and timely complaint was made to the trial judge and that the trial judge ruled on the complaint. TEX. R. APP. P. 33.1; *Lovill v. State*, 319 S.W.3d 687, 691 (Tex. Crim. App. 2009). The specificity requirement is met if the complaint made at trial was clear enough to the trial judge so as to permit the trial judge to take corrective action when the complaint was made. *Lovill*, 319 S.W.3d at 691. In other words, a general or imprecise objection may be sufficient to preserve error for appeal, but only if the legal basis for the objection is obvious to the court and to opposing counsel. *Miles v. State*, 312 S.W.3d 909, 911 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (citing *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006)); *see also Clark v. State*, 365 S.W.3d 333, 339

---

[1] Emphasis added.

(Tex. Crim. App. 2012) (stating that, for a complaint to be obvious without having been explicitly stated and still satisfy the purposes of requiring a specific objection, there must be statements or actions in the record that clearly indicate what the judge and opposing counsel understood the argument to be). "Error preservation does not involve a hyper-technical or formalistic use of words or phrases; instead, '[s]traight forward communication in plain English' is sufficient." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (quoting *Lankston v. State*, 827 S.W.2d 907, 908–09 (Tex. Crim. App. 1992)).

Appellant's objection at trial was that the State's closing argument was a "misstatement of the law." However, now appellant contends that the State's misstatement of the law impermissibly shifted its burden to appellant. The trial court overruled the objection, and appellant provided no further explanation. Appellant's objection did not meet the specificity requirement. There is nothing in the record clearly indicating that the trial court or opposing counsel understood what appellant's specific complaint was. *See Clark*, 365 S.W.3d at 339.

Moreover, appellant's objection at trial does not comport with his complaint on appeal. The complaint raised on appeal must comport with the objection made at trial. *Id.* If it does not, the complaint is not preserved for appeal. *See Pena*, 285 S.W.3d at 464 ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial."); *see also Lovill*, 319 S.W.3d at 691–92 ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."). In determining whether a complaint on appeal comports with a complaint made at trial, we look to the context of the objection and the shared understanding of the parties at the time. *Clark*, 365 S.W.3d at 339. Appellant's burden-shifting complaint on appeal is a separate and distinct argument from his misstatement-of-the-law objection lodged in during the State's closing argument.

Even if appellant had preserved error, we nonetheless conclude that it was not error for the trial court to overrule appellant's objection. Proper jury argument falls within one of the following categories: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) response to argument of opposing counsel; and (4) plea for law enforcement. *Davis v. State*, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010), *cert. denied*, — U.S. —, 132 S. Ct. 128 (2011). Argument that misstates the law or is contrary to the jury charge is improper. *Whiting v. State*, 797 S.W.2d 45, 48 (Tex. Crim. App. 1990); *Burke v. State*, 652 S.W.2d 788, 790 (Tex. Crim. App. 1983).

This case depended on the credibility of Janil's testimony and appellant's testimony. During the trial, appellant cross-examined Janil about why she did not initially tell the emergency room staff, her cousin, or Officer Sweatt that she was sexually assaulted. On cross-examination, Janil further stated that she did not make any attempt to locate any of the evidence in the case when she went back to the apartment to get her clothes and her children's clothes. During his own testimony, appellant denied breaking Janil's cell phones, having a gun, shaving Janil's head, and sexually assaulting her. Instead, appellant testified that Janil was lying about the events that took place during the drive back from Eagle Lake and after they had returned to the apartment. In his July 26, 2010 letter written from jail, appellant stated that he knew the State needed Janil's testimony to convict him. Appellant also explained in court that Janil did not want to testify against him, but the State was threatening to prosecute her for perjury.

During closing argument, appellant's trial counsel pointed out that the first thing Janil, who is a nurse, did was take a bath instead of leaving the apartment after the sexual assault, thereby compromising the evidence. Appellant's counsel also reminded the jury that Janil did not tell anyone about the sexual assault. Appellant's counsel further stated: "We know that Mrs. Farrow was a liar. How do we know that? She told us that. She admitted it. She admitted she lied to this person, to that officer, the hospital people, everybody she pretty much lied to. She admitted to that." Appellant's counsel also pointed out that Janil had been doing drugs that weekend and was "doped up on the

10

cocaine and Ectasy [sic]." At the conclusion of his closing argument, appellant's counsel summarized his argument by again stating that Janil was a "liar": "There is nothing there except for the words of Mrs. Farrow. And Mrs. Farrow, we know — she is a liar. We know she's crazy. And we know she's not a person whose testimony we can use to convict somebody of something that they did not do."

The State's argument was a summation of the evidence and a reasonable deduction from the evidence. Appellant's letter had been admitted into evidence and Janil had read the entire letter into the record. On cross-examination, appellant stated that Janil told him that she had lied about the sexual assault, but the State would prosecute her for perjury if she did not testify at his trial. The prosecutor summarized appellant's letter in which he stated that the State needed Janil's testimony to convict him. The prosecutor then stated that the case came down to whether the jury believed Janil or believed appellant. The State did not shift the burden when it stated, "[t]he only way that he walks out of here today is if you believe him over what she told you." That statement was merely a continuation of the State's argument that the crux of the case was Janil's credibility versus the defendant's credibility as shown by the prosecutor's statement immediately following appellant's objection that the jury's "job . . . [was] to judge the credibility of the witnesses."[2]

---

[2] Appellant relies on two federal appeals court cases in support of this issue. *See United States v. Cantu*, 876 F.2d 1134 (5th Cir. 1989); *United States v. Vargas*, 583 F.2d 380 (7th Cir. 1978). In *Vargas*, the prosecutor stated: "[T]hese federal agents have come in and testified under oath as to what they observed; and if you find the defendant not guilty, I want you to write on there that all of those people lied." *Vargas*, 583 F.2d at 387. The *Vargas* court observed that, even if the testimony of the prosecution and defense witnesses contained unavoidable contradictions, it did not follow "as a matter of law" that in order to acquit the defendant that the jury had to believe that the agents had lied. *Id.* Therefore, "[t]o tell the jurors that they had to choose between the two stories was error." *Id.* Similarly, in *Cantu*, the prosecutor's comments that were held to be inappropriate included, "If you want to find him not guilty, ladies and gentleman, you're going to have find that Mr. Renteria lied. That Agent Alvarez lied. That Agent Silva lied. That Agent Castaneda lied." *Cantu*, 876 F.2d at 1138 n.1. *Cantu* and *Vargas* are easily distinguished. The differences in the State's and appellant's theories were apparent throughout the trial. Both Janil's credibility and appellant's credibility were crucial to each side's theory. Moreover, the prosecutor did not tell the jury that it had to find that Janil was a liar in order to acquit appellant of sexual assault.

The prosecutor's argument was also an answer to opposing counsel's argument. During closing argument, appellant's trial counsel repeatedly pointed out that Janil did not immediately tell anyone about the sexual assault. The hospital records did not mention anything about cuts to the back of her head, and neither Officer Sweatt nor her cousin said anything about cuts to the back of her head. Appellant's counsel stated twice that Janil was "doped up" on cocaine and Ecstasy and was a "liar."

Even if the State's argument shifted the burden of proof to appellant, we conclude that it does not require reversal. Overruling an objection that the State's jury argument purportedly shifted the burden to appellant is constitutional error. *See Abbott v. State*, 196 S.W.3d 334, 344 (Tex. App.—Waco 2006, pet. ref'd). When constitutional error exists, we must reverse the judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction. TEX. R. APP. P. 44.2(a). In our harm analysis, we may consider (1) the nature of the error; (2) the extent emphasized by the State; (3) the probable collateral implications; and (4) the weight the jury may have given the error in its deliberations. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (limiting factors for assessing harm of constitutional error as previously stated in *Harris v. State*, 790 S.W.2d 568 (Tex. Crim. App. 1989)). Not every *Harris* factor will have logical application with respect to every conceivable constitutional error that may be subject to a harm analysis. *Id.* "An analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination

---

In any event, this court, in *Bacon v. State*, held that the following closing argument was permissible as a summation of the evidence and a reasonable deduction from the evidence: "Now you had a chance to observe these officers testifying face-to-face and had a chance to observe their demeanor and everything. And those officers appear to be the type of men that would intentionally lie about something like this, because if you find the defendant not guilty, basically that's what you're saying. Officer Bullard and Officer Shoemake, you're lying about this." *Bacon v. State*, 762 S.W.2d 653, 655 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd). The appellant complained that the argument was improper because it was bolstering, but this court held that the argument was proper because the appellant had attacked the officers' credibility. *Id.*

12

whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Id.* (quoting TEX. R. APP. P. 44.2(a)).

Appellant argues that error was not harmless beyond a reasonable doubt because "[t]he State's case was far from overwhelming." Appellant points to (1) Janil's failure to initially tell the emergency room staff, her cousin, and Officer Sweatt about the sexual assault; (2) the lack of forensic evidence to corroborate her story; and (3) Janil's inability to describe the gun.

Here, error, if any, was not emphasized by the State. The State did not make any other statements of a similar nature to the complained of statement. Instead, the State related to the jury the evidence supporting Janil's credibility, Janil's lack of motivation to lie, and appellant's motivation to lie. Nor do we believe that the jury placed a great weight on the complained of statement. As shown throughout the trial, the State and the defense relied on the credibility of their own witnesses and lack of credibility of the other side's witnesses. As appellant acknowledged, the State needed Janil's testimony in order to convict him of sexual assault. We conclude beyond a reasonable doubt that the error, if any, did not contribute to appellant's conviction. *See* TEX. R. APP. P. 44.2(a). We overrule appellant's issue.

Having overruled appellant's sole issue, we affirm the trial court's judgment.


/s/      Sharon McCally
         Justice

Panel consists of Justices Boyce, McCally, and Mirabal.[3]

Do Not Publish — TEX. R. APP. P. 47.2(b).

---

[3] Senior Justice Margaret Garner Mirabal sitting by assignment.

13