**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Louise H. MARSHALL, John M. Gliottoni, Jr. and Charles Panici, Defendants–Appellants.**

**Nos. 93–2858, 93–2881 and 93–2882.**

United States Court of Appeals,
Seventh Circuit.

Argued May 10, 1995.

Decided Jan. 24, 1996.

Barry Rand Elden, Chief of Appeals, Marsha A. McClellan (argued), Office of United States Attorney, Criminal Appellate Division, Chicago, IL, for U.S. in No. 93–2858.

Edwin Marger (argued), Jasper, GA, for Louise H. Marshall.

Chris C. Gair, Marsha A. McClellan (argued), Office of United States Attorney, Criminal Division, Chicago, IL, Barry Rand Elden, Chief of Appeals, Office of United States Attorney, Criminal Appellate Division, Chicago, IL, for U.S. in Nos. 93–2881 and 93–2882.

Anthony J. Onesto, Peter A. Regulski (argued), Onesto, Giglio, Meltreger & Associates, Chicago, IL, for John M. Gliottoni, Jr.

Allan A. Ackerman (argued), Chicago, IL, for Charles Panici.

Before POSNER, Chief Judge, WOOD, Jr. and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

From 1976 to 1991, Charles Panici was the mayor of the City of Chicago Heights, Illinois, while John M. Gliottoni, Jr. and Louise H. Marshall served as commissioners on the city council. However, their terms of office ceased when all three were indicted for substantive and conspiracy violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d).

In Count One of the indictment, each of the defendants was charged with conspiracy

to conduct the affairs of the City of Chicago Heights through a pattern of racketeering activity in violation of the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d). Count Two charged all three defendants with substantive racketeering, alleging thirteen specific predicate criminal acts, in violation of 18 U.S.C. § 1962(c). The three defendants were also charged with committing extortion, in violation of 18 U.S.C. § 1951. Charles Panici was also charged individually with committing extortion and bribery, as well as tampering with a witness, in violation of 18 U.S.C. §§ 1951, 666, & 1512(b)(3), respectively. Louise Marshall was individually charged with bribery, in violation of 18 U.S.C. § 666.

After entering pleas of not guilty, Panici, Gliottoni, and Marshall were tried jointly and the jury convicted each of them on all counts. The defendants' post-trial motions were denied, and thereafter the trial court sentenced Panici to 120 months' incarceration on each count, sentences to run concurrently, and ordered him to pay a $300 special assessment fee and $1,100,000 restitution. Gliottoni was sentenced to 60 months' imprisonment on each count, sentences to run concurrently, and ordered to pay a $150 special assessment fee and $1,100,000 restitution. Finally, Marshall was sentenced to 41 months confinement on each count, sentences to run concurrently, and ordered to pay $200 special assessment fee. Each defendant also received a term of 36 months supervised release to be served following their respective periods of imprisonment. The defendants appeal, raising numerous challenges to their convictions and sentences. We affirm.

## I. Background

### A. Political Structure of Chicago Heights, Illinois

The city of Chicago Heights, Illinois, is located in the southern suburbs of Chicago and is governed by an elected five-member city council, consisting of a mayor and four commissioners.[1] The council met publicly

about twice a month to discuss and vote on civic matters.

The evidence at trial revealed a network of corruption that had its seed in 1974, before the defendants were elected to the city council. At that time, John Gliottoni, a member of the Chicago Heights school board, met with Nicholas LoBue, a local resident and the owner of A.A. Arken Exterminating Company, and inquired of LoBue whether he was interested in running for the position of park district commissioner. LoBue replied yes, and Gliottoni directed him to meet with a local politician named Charles Panici, who was running as a candidate for mayor. In return for LoBue's promise of political loyalty to Panici, Panici supported LoBue's candidacy.

In 1975, Charles Panici was elected mayor and John Gliottoni and Louise Marshall were elected to the city council on the "Concerned Citizens ticket," a nonpartisan local party. LoBue was elected to the park district commission at the same time. Thus began sixteen years of bribery and extortion.

### B. The Schemes of Corruption

The evidence presented at trial, including extensive testimony from Nicholas LoBue, revealed that Mayor Panici, Commissioner Gliottoni, and Commissioner Marshall abused their positions for personal financial gain while serving in public office.

In 1976, many residents of Chicago Heights complained of a rust coloring in their drinking water, due to soluble iron present in the well water. To combat this rust color, the city contracted with Gulf Coast Laboratories, a local chemical company. Gulf Coast supplied the city with tri-polyphosphate (commercially known as "Tri–Lux"), a chemical that reacts with iron particles in the drinking water and eliminates the discoloration. However, Gulf Coast's agreement to supply the city with Tri–Lux included illegal payoffs to city officials.

At trial, Donald Gipple, the owner of Gulf Coast Laboratories, and Nicholas LoBue testified that the bribery scheme operated as

1. The mayor and commissioners are elected to four year terms of office and when voting on

issues before the council, the mayor votes as a fifth commissioner.

follows. From 1977 to 1979, the city ordered shipments of 35,000 pounds of Tri–Lux from Lobue's company, A.A. Arken. However, instead of delivering 35,000 pounds of Tri–Lux, A.A. Arken arranged for the private delivery of only 24,000 pounds of the chemical from Gulf Coast. The city paid Arken for the full 35,000 pounds; Arken paid Gulf Coast for only 24,000 pounds; and LoBue, the owner of Arken, retained the difference and distributed the overpayment between Panici, Gliottoni, himself, Ralph Galderio, and a friend of LoBue's, Mike Constabile. From 1977 to 1979, the city ordered the delivery of Tri–Lux three or four times a year, and the distributed pay-off on each delivery amounted to between $700 and $1000 per person.

In 1979, LoBue joined Panici's Concerned Citizens ticket and was elected to the city council, replacing another commissioner. To avoid exposure of the Gulf Coast arrangement, LoBue wrote a letter to the city council claiming that he could no longer sell Tri–Lux to the city because of his conflict of interest. At trial however, LoBue admitted that the letter was a sham and that he met with Gulf Coast officials and arranged to continue the over-billing and kickback scheme. As a result of LoBue's arrangement with Gulf Coast, the city began ordering shipments of Tri–Lux directly from Gulf Coast, bypassing Arken. The overpayment on each of these shipments was between $5,700 and $6,900.

In 1979, the city council was considering awarding a contract to provide cable television to the city and, according to city procedure, the council solicited bids from cable television companies. Mayor Panici advised LoBue that he and Gliottoni would be taken care of if they would vote to award the contract to Telecommunications Inc., a franchise owned by Panici's acquaintance. In a city council vote of May 1981, LoBue and Gliottoni voted as Panici had requested and each of them in turn had their palms greased with a $35,000 payoff.

In 1977, Marty Wondaal owned Fitzpatrick Brothers Disposal, a garbage disposal business, managed by Charles Fitzpatrick. Fitzpatrick Brothers Disposal submitted a bid for the 1977 residential trash pickup contract with Chicago Heights. Although Fitzpatrick Brothers was the low bidder, Commissioner Gliottoni told Charles Fitzpatrick that in order to secure the contract, the company would have to make a payoff. Marty Wondaal refused and the contract was awarded to another disposal company.

In 1980, Fitzpatrick Brothers again bid for the residential trash pickup contract, except this time the company made the payoff and was awarded the three-year contract. It was agreed that the first payment would be made to Don Prisco, the mayor of the neighboring city of South Chicago Heights and a close friend of the defendant Panici. Prisco gave the money to Panici, LoBue and Gliottoni. Altogether, Panici, LoBue, Prisco, and Gliottoni received $20,000 to $30,000 on the residential trash pickup contract.

In the early 1980s, Fitzpatrick Brothers bid on the residential trash pickup contract for 1983 to 1986, and was awarded it. Soon after the contract was awarded to Fitzpatrick Brothers, Albert Tocco, a Chicago Heights organized crime figure, see *United States v. Crockett*, 979 F.2d 1204 (7th Cir.1992), *cert. denied*, 507 U.S. 998, 113 S.Ct. 1617, 123 L.Ed.2d 176 (1993), bought the company from Wondaal, after threatening Wondaal with violence to accomplish the sale. In return for the residential trash pickup contract, Tocco agreed to kickback $900 a month to LoBue and Panici.

In 1984, the city council voted to increase garbage disposal service from weekly pickups to twice-weekly pickups and doubled the contract payment to Tocco. Accordingly, Tocco's kickback increased from $900 to $1800 per month. To hide the increased payoffs, A.A. Arken, LoBue's company, billed Tocco's garbage disposal company $1800 a month for pest control services at Tocco's company, which were never provided. LoBue deposited Tocco's payoff checks in the Arken company account and then endorsed a check payable to himself for $1800, giving $900 to Mayor Panici.

In 1980, Charles Fitzpatrick and Wondaal decided to form a corporation named Fitz–Mar, in hopes of securing a contract with Chicago Heights to operate the city's landfill.

Fitzpatrick and Wondaal met with Don Prisco and negotiated the amount of payment required to secure the contract. Prisco informed them that 10 percent of the total revenues would be paid to the city, as legitimate royalties, and 10 percent would be paid to the "boys," in addition to a $20,000 payment up front. Although the Fitz–Mar company had no experience in operating landfills, the city council awarded them the contract. Accordingly, Wondaal made the payoff with one-ounce gold coins, delivering them to Prisco who in turn gave them to Lobue. Under Panici's instructions, Lobue divided the gold coins among Panici, LoBue, Galderio, and Ernie Molyneaux, an individual on the landfill recommendation commission. After the initial payoff, Wondaal made monthly cash payments to LoBue, and they were divided among LoBue, Panici, and Prisco.

Wondaal fell behind in his payoffs, until he was $68,000 arrears in payments to the "boys." Unrelated to the extortion, concerns arose that the landfill was leaking toxins into the drinking water, and the Environmental Protection Agency ordered the shut down of the landfill operation and brought in a consulting engineer to address the problem. At that time, Mayor Panici told LoBue that the landfill would not reopen unless and until Wondaal brought his payoffs up-to-date. Wondaal paid $30,000 as directed in gold coins to comply with his illegal agreement, with 50 percent going to Mayor Panici, and 25 percent each to Prisco and LoBue.

In 1981, a tavern owner in Chicago Heights requested that the hours of his liquor license be extended. Mayor Panici, as head of the liquor commission, was responsible for the control of liquor licenses, including the extension of hours of operation. The tavern owner was instructed by a friend of LoBue, John Graham, to write a letter to Mayor Panici and enclose a $4000 cash payment, which he did; the extension of the operating hours was granted. Graham, LoBue's friend, gave the cash to Ralph Galderio, and the money was split between Panici, Galderio, and LoBue and used to finance a trip to Las Vegas. At trial, city records for the granting of extended hours were produced and reflected only a receipt of $750, the standard fee.

In 1983, the city decided to construct a pipeline to carry water from Lake Michigan, rather than drawing it from local wells. The cost of the project was projected to be $14 million and was to be funded by a bond issue. According to LoBue, the city's retained legal counsel, Jim Creswell, overbilled his time in preparing the bond issue, and split the difference between himself, Panici, and LoBue.

Robinson Engineering, a local firm headed by Dante DeSantis, joined with a number of contractors to form a joint venture to secure the contract. Mayor Panici instructed LoBue that there was a need for a kickback from the project, up to 1 or 2 percent of the contract. LoBue met with DeSantis, who spoke with the other contractors and they all agreed to make a combined payment of $100,000 to the city council. LoBue testified that when Louise Marshall became aware of the arrangement, she contacted him and inquired about the payoffs because the project came under the control of the department she supervised, the water department. Mayor Panici instructed LoBue that the payoffs would be split among Panici, LoBue, Gliottoni, and Marshall. DeSantis delivered the money in cash to LoBue, who in turn delivered $25,000 to each of the commissioners at their homes, as well as to Marshall at her home.

According to the testimony of LoBue, the water meters located in an older section of Chicago Heights were "underground and in parkways," making them inaccessible and difficult for city workers to read and service. (Tr. at 910). In 1983, the water department determined that the water meters would have to be excavated, replaced, and made more accessible by attaching them to the individual homes. Eugene Wuest, the owner of a plumbing company, prepared a bid and met with LoBue, who advised Wuest that 12 percent of the gross contract would have to be kicked back and split four ways. Wuest agreed and began work, submitting periodic invoices to the city for payment. Wuest then returned 12 percent of the city's payments to LoBue, who split the proceeds with Mayor Panici, Gliottoni, and Marshall. The project

continued on for several years and the kickbacks totalled approximately $80,000.

In the summer of 1989, when the water-meter project was nearing completion, Wuest realized that there was a need for additional work to complete the project and he approached Marshall concerning the problem. According to Wuest, Marshall instructed him to do the work and bill the city as "miscellaneous meter work," but that he should make the kickback payments directly to her and not to LoBue because "she hadn't gotten a fair share or a share in the past." Wuest did the work, billed the city, and gave the entire 12 percent ($9,763.60) kickback to Marshall. After delivering the payoff to Marshall, Wuest told her that there was additional water work to be done and Marshall instructed him to finish the project, bill the city, and kickback 7 percent to her.

In 1984, Curtis Schultz approached LoBue and inquired whether he might broker a health insurance contract to cover the city's employees. Schultz told LoBue that he earned 7 percent commission on premiums paid. LoBue told him that he would have to kickback 25 percent of the commissions to LoBue. LoBue took the proposal to Mayor Panici, who agreed and presented the health insurance proposal to the city council who awarded the insurance contract to Schultz. Schultz made the annual payoff, commencing in November 1984 with the writing of a check to cash, delivering the proceeds to LoBue. The kickback was approximately $9000, split between Panici and LoBue. After three years, Schultz suggested that the city switch to an HMO healthcare provider, and the city council approved. The payoffs continued until March 1991.

In 1989, the city acquired a federal government subsidized, low-income apartment complex in Chicago Heights. Although Commissioner LoBue was in charge of it, LoBue testified that Mayor Panici made all the decisions regarding the complex. An outside management firm, BNR Management owned by Rod Costello, a cousin of LoBue's, was appointed to manage the apartments on a day-to-day basis.

Sixty days after Costello took over management of the complex, he was approached by LoBue who told him that Panici and Gliottoni had demanded a $10,000 payoff. Although Costello initially balked at the proposition, he stated that because he was afraid of losing the account he made the payoff. Costello testified that two weeks after the payment he came in contact with Panici at a local restaurant and Panici advised him to "Do what we want or you're gonna have more trouble." Costello also stated that Panici interfered with the management of the apartments and made employment decisions, including replacing the security firm Costello had hired and putting Ralph Galderio on the payroll as a "Rehabilitation Coordinator and Code Enforcement Officer." Costello testified that Galderio in fact performed no duties, other than to run a weekly bingo game.

## C. The Investigation and Trial

The scheme of corruption began to unravel in August 1990, when LoBue and Don Prisco were indicted for filing false income tax returns and engaging in a racketeering conspiracy in violation of the RICO statute. The Federal Bureau of Investigation contacted Commissioner Marshall during its investigation of LoBue's violation of federal racketeering laws.

The FBI case agent for the investigation, Neal O'Malley, testified that during the investigation of LoBue he interviewed and took statements from Louise Marshall. Agent O'Malley interviewed Marshall on three occasions during 1990, concerning her knowledge of the City's garbage pick-up contracts, the Tri-Lux and Gulf Coast Chemical contract, as well as a possible health insurance scam perpetrated by LoBue.

In March 1991, LoBue decided to cooperate with the government.[2] Giving state-

2. LoBue signed a plea agreement on April 26, 1991 and entered a plea of guilty to a superseding indictment charging the filing of false tax returns and conspiracy to commit extortion and agreed to testify for the government. The government dropped the RICO counts against LoBue and agreed to recommend a downward departure in his sentence. LoBue received two terms of 20 months incarceration, to run concur-

ments to O'Malley and the Assistant U.S. Attorney Chris Gair (AUSA Gair), LoBue revealed a host of corrupt schemes and pay-offs to the government, including kickbacks on the cable television contract, the water pipeline project, water meters, the HMO insurance policy, twice a week garbage pickups, and the liquor licenses. After debriefing LoBue, Agent O'Malley and AUSA Gair contacted Marshall and told her that LoBue had implicated her in a kickback scheme from the water pipeline project.

According to Agent O'Malley, Marshall initially denied the accusation, but later admitted that she became aware of the kickbacks after the city had issued bonds in order to fund the pipeline project and at that time she attempted to join the corruption cesspool. Knowing Albert Tocco to be a powerful figure in the local organized crime operations, Marshall made contact with him and apparently asked him to convince LoBue and Panici to cut her in on a share of the extortion proceeds. After Marshall had cleared it with Tocco, LoBue delivered her three cash payments, totalling between $5000 and $7000.

After receiving more information from LoBue, O'Malley returned to Marshall's home with another FBI agent and inquired about other kickbacks from the water meter project and made her aware that LoBue had informed them that she had received total payoffs up to $45,000. She denied receiving $45,000, but did admit that LoBue had given her $4000 to $5000 from a source unbeknown to her. In May 1991, Marshall met Agent O'Malley and AUSA Gair at the AUSA's office, where once again she was questioned about her receiving $20,000 from the pipeline deal and $25,000 from the water meter project. According to Agent O'Malley, Marshall admitted she received $5000 to $7000 from LoBue at the time of the water pipeline project, and that the money probably came from an illegal kickback.

At trial, Louise Marshall contradicted Agent O'Malley's testimony, testifying that she never bothered LoBue for money; never asked Albert Tocco to influence LoBue and Panici to allow her to participate in the extortion schemes; and never told Agent O'Malley

rently, and was ordered to pay $136,000 in total

or AUSA Gair that LoBue gave her $5000 to $7000.

At the close of Marshall's direct examination, her counsel objected and asserted that AUSA Gair should not be allowed to cross-examine Marshall for he was not only present but also participated in two of Marshall's interviews. The defendants argued that in all probability AUSA Gair would be called as a witness and thus there would likely be conflict between Agent O'Malley's testimony and that of Marshall. At a sidebar conference, the defendants objected to the questioning, arguing that allowing him to participate as the prosecutor would violate the advocate-witness rule. The district court denied the objections, ruling that there was no violation of the advocate-witness rule because the defendants now stated that they were not going to call AUSA Gair as a witness. Gair conducted the cross-examination of Marshall where the following exchange took place:

Q. Commissioner Marshall, isn't it a fact that on April 25th of 1991 you met with Agent O'Malley and myself in your home.

A. That I did.

Q. And didn't you tell us at that time you went to Nick LoBue and told him that you felt that money was being distributed and that you should be part of the money?

A. I never told you that.

Q. Commissioner Marshall, isn't it true that Mr. LoBue told you that the contractors needed all the money for their expenses, their material and their labor?

A. That is what he told me, but I never told him that I wanted any money from him. And I never told you that I told him I wanted any money.

\* \* \* \* \* \*

Q. When you met with me and Mr. O'Malley on April 25th there in your living room, didn't you say: For this reason I went to Albert Tocco who at the time held the garbage disposal contract for about one year and told him that you felt you were being mistreated?

restitution.

A. Mr. Gair, I did not tell you that.

(Tr. at 2696–97, 2703–04).

The jury found each of the defendants guilty on all counts.

## II. Analysis

### A. Severance

Shortly before the start of trial, Panici and Gliottoni asked for a severance, requesting that their trials be separated from Marshall's. They asserted that because Marshall had made statements to FBI agents that inculpated them and that any redaction of their names from the statements would be insufficient to overcome the prejudice. The motion was denied. During the trial, the defendants renewed their motions for severance, and they were again denied. The district judge, in order to ensure a fair trial, also gave the following cautionary instruction to the jury:

> Counsel, before you proceed, I want to advise the members of the jury that it is the intent of the government to elicit testimony by this witness with reference to statements he will testify were made to him by Louise Marshall.
>
> I instruct you that this evidence is being offered only against the defendant Louise Marshall and may not be considered against either of the other defendants in this case.

(Tr. at 2454).

The defendants now argue that the denial of the motion for severance was prejudicial because the FBI Agent's testimony against Marshall implicated them, and thus they were unable to receive a fair trial. However, the defendants have failed to point to any specific testimony of Agent O'Malley that implicated them in any criminal activity.

■ Rule 14 of the Federal Rules of Criminal Procedure provides: "If it appears that a defendant or government is prejudiced by a joinder of ... defendants ... for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice requires." However, the district court's ruling will not be disturbed absent an abuse of

discretion. *United States v. Boykins,* 9 F.3d 1278, 1288 (7th Cir.1993); *United States v. Stillo,* 57 F.3d 553, 557 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995).

"There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993).

> When a group of people are charged with participating in the same crime, they ordinarily are tried together even if the evidence is stronger against one or some than against others. The danger of prejudice to the least guilty, or perhaps prejudice to all from the sheer confusion of a multidefendant trial, is in all but the most unusual circumstances considered outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all.

*United States v. Shorter,* 54 F.3d 1248, 1258 n. 21 (7th Cir.) (quoting *United States v. Velasquez,* 772 F.2d 1348, 1352 (7th Cir. 1985)), *cert. denied,* —— U.S. ——, 116 S.Ct. 250, 133 L.Ed.2d 176 (1995). "Our decisions have consistently held that a defendant challenging a district court's denial of a severance motion must establish that he suffered 'actual prejudice' resulting from the denial of the motion." *United States v. Pulido,* 69 F.3d 192, 207 (7th Cir.1995) (citing cases).

■ The trial judge denied the defendants' motion for severance and ordered any reference to Panici and Gliottoni be redacted from the FBI statements. Further, the district court directed the AUSA not to ask any questions of the FBI Agent that might elicit testimony implicating the other defendants. Also, the trial judge specifically instructed the jury, as pointed out earlier, that Agent O'Malley's testimony about what Marshall told him could be used only against Marshall and not the other defendants. *See Stillo,* 57 F.3d at 557 (a criminal defendant "must rebut the dual presumptions that a jury will (1) capably sort through the evidence and (2) follow limiting instructions from the court to consider each defendant separately.") (quoting *United States v. Lopez,* 6 F.3d 1281, 1286 (7th Cir.1993)). Finally, the evidence against

Panici and Gliottoni was overwhelming: witness after witness testified that bribes were paid to Mayor Panici and Commissioner Gliottoni. Because there was no reference in Agent O'Malley's testimony to the defendants that would cause them prejudice, we agree with the trial judge's ruling and conclude that the trial court did not abuse its discretion in denying the motion for severance.

### B. Advocate Witness

Marshall individually and the defendants collectively argue that the government's cross-examination of Marshall deprived her and the other defendants of a fair trial—because the AUSA referred to a meeting of Marshall, the AUSA, and an FBI Agent; the AUSA's questions indicated that he had been present at a meeting where Marshall allegedly made statements that she had received $5000 to $7000 in kickback money from LoBue. The defendants argue that AUSA Gair's cross-examination of Marshall about the meetings where he was present and participating violates the advocate witness rule because it is 'subliminal testimony' on the part of the prosecutor that improperly served to buttress the disputed testimony of the FBI Agent.[3]

▐ Under the advocate-witness rule, counsel is barred from acting as both an advocate and a witness in a single proceeding except under special circumstances. *United States v. Ewing,* 979 F.2d 1234, 1236 (7th Cir.1992) (quoting *United States v. Morris,* 714 F.2d 669, 671 (7th Cir.1983)). "[W]here an attorney improperly appears as both an advocate and a witness in the same litigation, the sanction of reversal and a new trial *may* be warranted." *United States v. Angiulo,* 897 F.2d 1169, 1194 (1st Cir.1990) (emphasis added). Whether a mistrial should be granted falls within the trial court's discretion and we will not reverse a ruling on such a motion "absent a clear and prejudicial abuse of discretion." *United States v. Ashman,* 979 F.2d 469, 494 (7th Cir.1992) (quoting *United States EPA v. City of Green Forest,* 921 F.2d 1394, 1409 (8th Cir.1990), *cert. denied,* 502

U.S. 956, 114 S.Ct. 62, 116 L.Ed.2d 435 (1993).

▐ A review of the testimony reveals that the AUSA in cross-examination phrased his questions to Marshall impartially. During his examination of Marshall, AUSA Gair made but two clear and simple references to the fact that he was present during her interview with FBI Agent O'Malley. However, he made no assertion that *he* (AUSA Gair) believed Marshall was lying, rather he simply contrasted her testimony with that of Agent O'Malley. Further, Gair's reference to his presence at two of the meetings served to clarify which of the many interviews between Marshall and Agent O'Malley that he, AUSA Gair, was referring to when questioning Marshall regarding the differences between Marshall's statements to Agent O'Malley and Marshall's testimony on direct examination. Finally and most importantly, Gair was not called upon to testify as a witness and there was therefore no conflict and the advocate witness rule was not violated.

We note that if Marshall's argument were successful it would bar prosecutors from cross-examining a defendant if that prosecutor had participated in an interview with the defendant prior to trial. Thus, if the AUSA conducted a fact-finding interview of a suspect before authorizing the issuance of a formal charge, he or she would be barred from prosecuting the defendant at trial. A result of this nature strikes us as an inaccurate application of "the advocate-witness rule, ... misstates the reasons underlying that rule ... and it misstates the common sense of the situation presented to the jury," *Hanrahan v. Thieret,* 695 F.Supp. 372, 393 (N.D.Ill.1988), *rev'd on other grounds,* 896 F.2d 241 (7th Cir.1990), and this is not the law.

### C. Prosecutorial Misconduct

The defendants argue that they are entitled to a new trial based on various statements made by the government during the government's closing rebuttal argument.

---

**3.** We interpret the defendants' argument that the AUSA "subliminally testified" by cross-examin-

ing Marshall as an argument that the AUSA "vouched" for the credibility of the FBI agent.

A trial judge's decision regarding prosecutorial misconduct is reviewed for an abuse of discretion for we "assume that the trial judge is in the best position to determine whether an incident was so serious as to warrant a mistrial." *United States v. Humphrey*, 34 F.3d 551, 556 (7th Cir.1994) (quoting *United States v. Canino*, 949 F.2d 928, 937 (7th Cir.1991)). Assessing allegations of prosecutorial misconduct, we follow a two-step analysis:

> We begin by looking at the disputed remarks in isolation to determine if they were proper. If we find the comments were proper, our analysis ends. If however, we find the comments were improper, we must then look at the remarks in light of the entire record to determine if the defendant was deprived of a fair trial. *United States v. Badger*, 983 F.2d 1443, 1450 (7th Cir.), *cert. denied* [— U.S. ——], 113 S.Ct. 2391 [124 L.Ed.2d 293] (1993); *United States v. Osuorji*, 32 F.3d 1186, 1191 (7th Cir.1994), *cert. denied* [—— U.S. ——], 115 S.Ct. 919 [130 L.Ed.2d 799] (1995). In determining the effect on the fairness of the trial we consider: 1) the nature and seriousness of the prosecutorial misconduct; 2) *whether the prosecutor's statements were invited by conduct of defense counsel;* 3) whether the trial court instructions to the jury were adequate; 4) whether the defense was able to counter the improper arguments through rebuttal; and 5) the weight of the evidence against the defendant. *Badger*, 983 F.2d at 1450; *Osuorji*, 32 F.3d at 1191.

*United States v. Butler*, 71 F.3d 243, 254 (7th Cir.1995) (emphasis added).

In order to make clear what is alleged as government misconduct, we deem it necessary to place the challenged statements in proper context by quoting a portion of the defendant's closing argument:

> When Mr. Gair and his agents went to Louise Marshall's home on the night of 4/25/91, they went with both fire and venom. They went because the monster they had spawned said that Louise Marshall had done something. When they went that night, based upon what Nick LoBue had told them, they lost all of their objectivity. They were determined that they were going to crack Louise Marshall.

> . . . . .

> At the beginning of trial you were instructed that a federal agent's word [counts] for no more than the next witness. I assure you of this, that when they are tickled, they laugh, when they are pricked, they bleed, and when they are hit hard enough, they fall over, and sadly enough they don't always tell the truth.

(Tr. 2998–99). The government responded to this closing argument with the following:

> MR. GAIR: Now the defense of Mrs. Marshall really comes down to this: everybody's lying. Wuest is lying. DeSantis is lying, LoBue is lying. That's a given. And Agent O'Malley is lying. In fact, not just that Agent O'Malley is lying, but that he's fabricated three reports, made it up from start to finish. That's what she said from the witness stand.

> . . . . .

> MR. GAIR: And ladies and gentlemen, if you believe for one second, for one instance that Agent O'Malley did anything other than tell you exactly what happened in those interviews, don't deliberate. Just come right out and say it: not guilty as to Louise Marshall. Just say it. Because Agent O'Malley has no reason and would never do anything like that. It's an insulting, disgusting, despicable suggestion made by somebody who's desperate.

(Tr. 3029–31).

Defendants argue that AUSA Gair's rebuttal, arguing that FBI Agent O'Malley would not lie and if the jury believed he was lying then it should acquit, resembles the improper remarks made in *United States v. Vargas*, 583 F.2d 380 (7th Cir.1978). In *Vargas*, the prosecutor made the following statements, which the court found to be improper:

> these Federal agents have come in and testified under oath as to what they observed; and if you find the defendant not guilty, I want you to write on there that all of those people lied. [Agent] Ricevuto is a liar. [Agent] Garcia is a liar. [Agent]

Collins is a liar. [Agent] Kowalski is a liar. [Agent] Fanter is a liar.

583 F.2d at 387. The *Vargas* prosecutor informed the jury that the defendant could be found not guilty *only* if *all* the federal agents were lying. This assertion distorted the burden of proof. *Id.* The jury may reach a verdict of not guilty if in their opinion the government has failed to present adequate proof of guilt beyond a reasonable doubt of each and every element of the crime charged against each individual respectively, not that the federal agents were necessarily lying. *Id.*

Applying the test, initially we must determine whether the prosecutor's remarks were improper. In the case before us, Gair's statements differ significantly from those found improper in *Vargas.* Gair urged that the jury should find Marshall not guilty if they believed Agent O'Malley was lying. However, the AUSA did not state that it was the *only* way to find her not guilty. The prosecutor in *Vargas,* by contrast, presented the jury with an improper mandate—*all* the FBI agents *must* be lying in order to find the defendant not guilty. The *Vargas* prosecutor's comments left no room for the jury to "return a verdict of not guilty because the evidence might not be sufficient to convict defendant beyond reasonable doubt." *Id.* at 387. In the case before us, we conclude that the prosecutor's statements fail to rise to the level of prejudicial error as those made in *Vargas.*

Evaluating the prosecutor's comments in the case under consideration and in light of our review of the entire record and the factors enunciated in *Butler,* we conclude that the defendants were not deprived of a fair trial. Initially, as set forth, the comments were not as egregious as those in *Vargas* as the defendants contend, because the jury was not presented with stark, bright-line, and absolute alternatives that might serve to distort the burden of proof. Second, the comments of the defense attorney, quoted above, clearly *invited* the prosecutor to reply to the accusation that Agent O'Malley was not objective and could be lying. *See Butler,* 71 F.3d at 255–56 (prosecutor's comments could be viewed as invited by the defense's attack

on the credibility of a police officer's testimony). Defense counsel stated that the federal agents were out "to crack" Louise Marshall; the government responded that such an accusation was "desperate." Although we do not approve of the prosecutor's strongly-worded response, it does not rise to the level of prejudice to warrant a mistrial. Also, the trial judge recited and explained to the jury each of the respective defendant's individual theories of defense, instructing that "[e]ach defendant is presumed to be innocent of the charges [and the presumption of innocence] is not overcome as to any defendant unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty." Further, the trial judge instructed that "[t]he government has the burden of proving the guilt of each defendant beyond a reasonable doubt and this burden remains on the government throughout the case. A defendant is not required to prove innocence or produce any evidence." *Id.* "[W]e generally presume that juries follow instructions." *Butler,* 71 F.3d at 252; *United States v. Nobles,* 69 F.3d 172, 184 (7th Cir.1995). Finally and most important, the evidence against each of the defendants Marshall, Panici, and Gliottoni was overwhelming. The government presented witnesses attesting to each of the kickback schemes and the specific payment of bribes to each of the commissioners. We are convinced that even were we to consider the prosecutor's comment as improper, the defendants would have suffered no prejudice and thus the error was harmless and the defendants were not deprived of a fair trial.

### D. Marshall's Appeal

Louise Marshall argues that the cumulative acts of prosecutorial misconduct warrant a new trial. She points to the violation of the advocate witness rule and the prosecutor's rebuttal argument. However, as we have previously ruled, the advocate witness rule was not violated in this case and the prosecutor's single remark in his rebuttal argument, responding to the defense accusation that FBI Agent O'Malley had lied, in our opinion

did not deprive the defendants of a fair trial.[4]

■ Marshall's final argument is that the AUSA's cross-examination of her concerning her alleged unethical actions constituted reversible error. Attempting to impeach Marshall, the AUSA asked her whether she used to jointly own bank accounts with an acquaintance, Fannie Martin; and in 1987, when Fannie Martin died, whether Marshall became the owner of the bank accounts and was named as trustee of Martin's estate, without reporting her trustee status to the proper probate court, implying that Marshall might have acted unethically, avoided paying taxes, and neglected her fiduciary duties. Marshall contends that this constitutes "bad character" evidence, in violation of Federal Rule of Evidence 404(b).[5] Marshall asserts that while acting as trustee of Martin's estate, she was not obligated to report her position to the probate court, despite the prosecutor's implication, and that she was never charged with the crime of tax evasion, but rather merely paid her taxes in full after the IRS alerted her in 1990 that she owed additional taxes on her filing in 1987.

■ "Trial Judges have considerable discretion in making evidentiary rulings, and we reverse these rulings only if there was a clear abuse of that discretion." *Butler*, 71 F.3d at 250 (citing *United States v. Rodriguez*, 925 F.2d 1049, 1053 (7th Cir.1991)); *United States v. Gootee*, 34 F.3d 475, 477 (7th Cir.1994); *United States v. Hilgeford*, 7 F.3d 1340, 1345 (7th Cir.1993). We are of the opinion that the prosecutor's careless and suspect type of inquiry was at best a questionable form of cross-examination and the trial court would not have committed error in ordering it excluded; nevertheless, even were we to deem it error, the error was harmless and did not cause Marshall prejudice sufficient to warrant reversal. With regard to the under-reporting of taxes, the prosecutor offered no proof that Marshall intentionally misled the IRS or that she had been criminally prosecuted by the IRS. The prosecutor's inquiry served only to infer that Marshall could have been negligent or careless in filing her tax returns. Although the AUSA implied that Marshall should have disclosed her status as trustee of an estate to Illinois probate court, there was neither evidence nor citation to any Illinois caselaw much less any statute that Marshall might have violated. Indeed, the trial judge instructed the jury that under Illinois probate law, Marshall was not required to report her assets to the probate court. (Tr. at 3040). However, even if "the district court may have erred in an evidentiary ruling, this Court will not reverse if the error was harmless." *United States v. Wimberly*, 60 F.3d 281, 286 (7th Cir.1995) (citing *United States v. Saunders*, 973 F.2d 1354, 1359 (7th Cir.1992)). "[I]f the evidence of guilt was overwhelming and the defendant was allowed to put on a defense, even if not so complete a defense as [s]he might have reasonable desired, this Court will find the error harmless." *Id.* (citing *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir.1993)). In Marshall's case, the error was harmless: several witnesses personally attested to paying thousands of dollars in bribes to Marshall, including those from Eugene Wuest and Nicholas LoBue. Additionally, the jury heard evidence from FBI Agent O'Malley that Marshall had admitted to him that she received kickback money from LoBue. *See United States v. Brown*, 31 F.3d 484, 491 (7th Cir.1994) (holding Rule 404(b) error harmless in light of the cumulative nature of the testimony against the defendant).

### E. Panici's Appeal

■ Charles Panici appeals his sentence, challenging the district court's calculation of

---

**4.** Marshall also argues that the prosecutor was guilty of misconduct when, in his rebuttal, he characterized her statements to FBI Agent O'Malley as "confessions." However, Marshall's objection to the remark was sustained and the words were stricken from the record. Even if improper, the single statement did not rise to the level of prejudicial error to deprive Marshall of a fair trial.

**5.** Federal Rule of Evidence Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

his base offense level. Under the United States Sentencing Guidelines, extortion by a public official results in a base offense level of ten. U.S.S.G. § 2C1.1(a). The base offense level increases corresponding to the dollar loss as a result of the crime. *See* U.S.S.G. § 2C1.1(b)(2)(A) (referencing the table in § 2F1.1(b)(1) for calculation of the increase in level). Specifically, Panici argues that the prosecutor's calculated loss figure to the city from the 1983 garbage hauling contract awarded to Albert Tocco was inaccurate.

In 1983, the city of Chicago Heights paid Fitzpatrick Brothers Disposal (then owned by Albert Tocco) $45,000 per month to pick up the residential trash in the city (monthly kickback $900). In 1984, when twice-weekly pickups were instituted, the contract price rose to $90,000 and increased the monthly kickback to $1800. At trial, Charles Fitzpatrick, the former manager of Fitzpatrick Brothers Disposal, testified that the city council's decision to institute twice weekly garbage pickups was unnecessary because the trash generated certainly fell far short of warranting twice-weekly pickups. Fitzpatrick, who had managed Fitzpatrick Brothers Disposal for over twenty years, calculated that the increased costs of twice-weekly pickups would only be around 10 percent. The overhead costs and landfill fees depended on the volume of trash collected, which for Chicago Heights remained the same whether the trash was collected once or twice a week. The added cost would be transportation, labor costs as well as vehicle wear and tear; the accuracy of Fitzpatrick's testimony was unchallenged. Based upon Fitzpatrick's trial testimony, the government, for purposes of sentencing, assumed that there was a thirty percent increase in the cost of twice-weekly pick-ups. This calculation resulted in a monthly loss of $31,500 to the citizens of Chicago Heights for the thirty-eight months the contract was in force. The government's calculations together with the amount of the other kickbacks to Panici (water pipeline, cable television, Tri–Lux, etc.) exceeded $1.5 million. Based upon Fitzpatrick's testimony, the district court calculated a total loss to the city of over $1.5 million, with a resulting increase of twelve offense levels.

§ 2F1.1(b)(1)(M). Panici contends that this calculation was erroneous.

"A defendant has the due process right to be sentenced on the basis of accurate information." *United States v. Salinas*, 62 F.3d 855, 859 (7th Cir.1995) (citing *United States v. Mustread*, 42 F.3d 1097, 1101 (7th Cir. 1994)). "We review the district court's calculation of the amount of loss associated with a defendant's offense under § 2F1.1(b) for clear error." *United States v. Yusufu*, 63 F.3d 505, 513 (7th Cir.1995); *United States v. Holiusa*, 13 F.3d 1043, 1045 (7th Cir.1994). "[W]e will only reverse if we are left with the definite and firm conviction that a mistake has been made." *United States v. Briscoe*, 65 F.3d 576, 589 (7th Cir.1995) (citing *United States v. Dillard*, 43 F.3d 299, 308 (7th Cir. 1994)).

Panici has failed to provide us with any evidence in contradiction of Fitzpatrick's testimony, other than to state that the calculation was "inaccurate." However, the standard of review for such calculations is *clear* error. The record reflects that the testimony of Fitzpatrick, an experienced manager of a trash hauling operation who obviously had knowledge of rates, charges, and costs of the trash hauling industry, was unchallenged, and the government made a conservative calculation based on that testimony. We are not persuaded that the district court committed clear error in relying on Fitzpatrick's testimony in making the loss calculation.

### F. Gliottoni's Appeal

 John M. Gliottoni argues that the district court erred in failing to grant his motion to dismiss Count Two as duplicitous. Conviction of a RICO violation requires proof that an individual engaged in the affairs of an enterprise, through the commission of two or more predicate criminal acts. *United States v. Stephens*, 46 F.3d 587, 592 (7th Cir.1995). Count Two of the indictment alleged that the defendants engaged in a pattern of racketeering, consisting of thirteen criminal acts. Gliottoni asserts that three of the predicate acts supporting Count Two (Racketeering Acts Four, Seven, and Eleven) contain duplicitous charges.

Racketeering Act Four alleged that Gliottoni committed *bribery* in violation of Illinois Rev.Stat., ch. 38, sec. 33–1(d) in accepting cash payments from Marty Wondaal to influence official decision-making; and committed *extortion* in violation of 18 U.S.C. § 1951 in obtaining cash payments from Wondaal "under color of official right." The indictment states that either of the crimes of bribery or extortion alone constitutes the predicate racketeering act. Similarly, Racketeering Act Seven alleges that Gliottoni committed bribery and extortion in accepting payment for the award of the landfill contract, with either act constituting the racketeering act. Racketeering Act Eleven alleges that Gliottoni engaged in a conspiracy to commit bribery and a conspiracy to commit extortion in accepting payments to influence the award of the water meter project, with either conspiracy constituting the racketeering act.

Gliottoni argues that because bribery and extortion are separate and distinct crimes, the indictment's inclusion of alternative theories regarding the predicate acts constitutes duplicitous pleading which fatally flaws the indictment.

■ "Duplicity" is the joining of two or more offenses in a single count. *United States v. McKneely*, 69 F.3d 1067, 1072 (10th Cir.1995); *United States v. Berardi*, 675 F.2d 894, 897 (7th Cir.1982).

> The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or both. Adverse affects on a defendant may include improper notice of the charges against him, prejudice in the shaping of evidentiary rulings, in sentencing, in limiting review on appeal, in exposure to double jeopardy, and of course the danger that a conviction will result from a less than unanimous verdict as to each separate offense.

*United States v. Blandford*, 33 F.3d 685, 699 n. 17 (6th Cir.1994) (quoting *United States v. Duncan*, 850 F.2d 1104, 1108 n. 4 (6th Cir. 1988)), *cert. denied*, —— U.S. ——, 115 S.Ct. 1821, 131 L.Ed.2d 743 (1995).

In *United States v. Yarbrough*, 852 F.2d 1522 (9th Cir.), *cert. denied*, 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988), the defendant was charged with a RICO violation where one of the predicate acts contained two separate offenses: *disposing* of $3.6 million of robbery proceeds and *receiving* $10,000 of that money. The Ninth Circuit held that there was no duplicity because the defendant was "charged" with a single federal crime—a violation of the federal racketeering laws. Because the separate offenses constituting the predicate act were not "charged offenses," the court ruled that the indictment was not duplicitous. *Id.* at 1530–31. However, the Third Circuit has expressly disagreed with this position. In *United States v. Pungitore*, 910 F.2d 1084, 1136 (3d Cir.1990), *cert. denied*, 500 U.S. 916, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991), three separate offenses constituted a predicate act: murder, attempted murder, and conspiracy to murder. "The fact that the appellants were specifically charged with racketeering, rather than with offenses involving murder, does not mean that the dangers associated with duplicitous pleading were not present in this case." *Id.* The Third Circuit was concerned that "[h]ad the jury returned only a general verdict as to the RICO predicates, we might have difficulty ascertaining the basis for the jury's findings as to individual predicates, and there might be a real question regarding the unanimity of the verdict." *Id.* However, the district court in *Pungitore* solved the duplicity problem because the jury, in response to the court's special interrogatories, specified which theory of murder it relied upon to find the defendant guilty of the predicate racketeering act. *Id.*

■ As a threshold matter, we must analyze whether the charged crimes of bribery and extortion are separate offenses. The Illinois bribery statute provides that:

> A person commits bribery when ... he receives, retains or agrees to accept property ... which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of any public officer. ...

720 ILCS 5/33–1(d).

The Hobbs Act provides:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or *extortion* or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more that $10,000 or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The Act defines *extortion* as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). However, under the Hobbs Act, a public official need not demand payment to satisfy the elements of extortion; "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans v. United States*, 504 U.S. 255, 268, 112 S.Ct. 1881, 1889, 119 L.Ed.2d 57 (1992). Accordingly, the district court instructed the jury that "Extortion under color of official right means that a public official has obtained a payment to which he was not entitled knowing that the payment was made in return for official acts." (Tr. 3051).

Because the public official may passively accept payment (in exchange for the performance of official acts), the distinction between the elements of extortion applied to a public official under the Hobbs Act and the elements of bribery under Illinois law appear subtle at best. *See United States v. Holzer*, 840 F.2d 1343, 1352 (7th Cir.) (observing that perhaps in every case of extortion under color of right the extortionist might also be considered a bribe-taker), *cert. denied*, 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988).

However, even if the offenses are arguably separate and distinct, the trial court in this case was careful to ensure that the jury's conviction relied unanimously upon one of the theories by giving the following instruction:

> To prove that a defendant committed a racketeering act that consists of two or more offenses, it is sufficient that the government proves beyond a reasonable doubt that the defendant committed at least one of the offenses charged and identified in the subparagraphs of the racketeering act. However, with respect to a racketeering act in Count 2, which consists of multiple offenses, *you must unanimously agree upon which of the offenses alleged within the racketeering act the defendant committed.*

(Tr. at 3048).

Although the crimes of bribery and the Hobbs Act definition of "extortion under color of official right" are arguably separate offenses, they are closely linked and, in many instances as in this case are based upon similar evidence. In Count Two of the indictment, the evidence supporting the crimes for each predicate act was identical: for act four—kickbacks from the 1980 garbage contract; for act seven—kickbacks from the landfill contract; for act eleven—kickbacks from the water meters contract. We are convinced from our review of the record that a reasonable jury could have found Gliottoni guilty of either bribery or extortion. Further, the possibility of jury unanimity that concerned the Third Circuit in *Pungitore* is not present in Gliottoni's case: Gliottoni's trial judge instructed the jury that it must unanimously agree as to which offense the defendant was guilty of, if either. A reading of the indictment leads us to the conclusion that it was not fatally flawed.

 Finally, Gliottoni challenges four of the district court's evidentiary rulings. As we have previously stated, the trial court has considerable discretion in rendering its evidentiary rulings and we reverse only where there has been a clear abuse of that discretion. *Butler*, 71 F.3d at 250–51; *Gootee*, 34 F.3d at 477. Abuse of discretion occurs when no reasonable person could agree with the trial court's position. *Hilgeford*, 7 F.3d at 1345.

 The evidentiary rulings Gliottoni challenges are: Initially, he argues that it was error to admit evidence of bribes paid by Costello (the recipient of the housing management contract) to LoBue because the bribes were not included in the indictment.

However, the defendant was charged in Count One of the indictment with conspiring with LoBue and *others* to operate the city of Chicago Heights through a *pattern* of extortion, bribery, and official misconduct. The Costello bribes highlighted one aspect and were part and parcel of the conspiracy scheme in Chicago Heights and were thus admissible. *See Crockett,* 979 F.2d at 1210–11 (holding that the terms of the charged RICO conspiracy were broad enough to encompass murders not specifically listed as predicate acts).

[17] Second, Gliottoni claims that evidence of bribes paid in 1975 by him to LoBue in order to obtain construction contracts were inadmissible because those particular bribes were not included in the charged conspiracy. However, the initial bribes in 1975 formed the seed of the relationship between LoBue and the co-conspirators and explains their mutual trust. *See United States v. Marks,* 816 F.2d 1207 (7th Cir.1987) (evidence of prior bad acts amongst the defendants critical to the jury's understanding of the background of the conspiratorial relationship); *United States v. Penson,* 896 F.2d 1087, 1092 (7th Cir.1990) (evidence of similar prior bad acts explained how defendant came to be associated with the other conspirators).

[18] Third, Gliottoni asserts that the government's cross-examination of defense witness James Pinkart constituted reversible error. Rod Costello, the manager of a low-income housing property in Chicago Heights, testified that on one occasion Gliottoni demanded that Costello switch to another pest control company, Alpha Pest Control. To counter this testimony, the defense called James Pinkart who testified that he submitted a bid on behalf of Alpha–Pest without the assistance of Gliottoni. During cross-examination, the government inquired of Pinkart whether he was biased against the U.S. Attorney's office because his father had been convicted and incarcerated by the government. The trial judge denied Gliottoni's objection to the evidence, ruling that the probative value was not outweighed by the danger of prejudice. We agree with the district court that, despite Gliottoni's claim that the evidence of Pinkart's father's prosecution was prejudicial to him, the exposure of a witness's motivation for testifying is certainly a critical component of cross-examination. *Delaware v. Van Arsdall,* 475 U.S. 673, 678–79, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

[19] Fourth, Gliottoni argues that the government elicited improper hearsay evidence from Rod Costello. Costello, a government witness, was impeached on cross-examination by the defendant because he had given contradictory statements to investigators. In order to rehabilitate Costello, the government asked him what motivated his contradictory statements: Costello admitted that an individual, Bob Daldeegan, had approached him and told him that if he testified against LoBue his job would remain safe. Hearsay includes statements, other than those offered by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. A hearsay statement generally is not admissible. Fed. R.Evid. 801(c). The evidence of what Daldeegan said is not hearsay: it was not admitted to establish the truth of the statement (that Costello would *in fact* retain his job if he testified against LoBue). Rather, the evidence was admitted to establish Costello's motive for giving inconsistent statements to the investigator. Again, the district court did not abuse its discretion.

## III. Conclusion

The convictions and sentences of Charles Panici, John Gliottoni, and Louise Marshall are Affirmed.